**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BANNER HEALTH f/b/o BANNER GOOD SAMARITAN MEDICAL CENTER, et al., | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | Civil Action No. 10-cv-1638 (CKK) |
| KATHLEEN SEBELIUS, Secretary, Department of Health and Human Services, | ) ) | |
| Defendant | ) ) | |

**<u>DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND
FAILURE TO STATE A CLAIM</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................. 1

BACKGROUND .................................................................................................................... 3

    I.     Statutory and Regulatory Background.................................................................... 3

          A.     Medicare Outlier Payments....................................................................... 3

          B.     Past Abuses of the Outlier Payment System and 2003 Refinements to the Outlier Payment System ......................................................................... 11

          C.     The Health Care Fraud and Abuse Control Account ................................ 14

    II.    Factual Background ............................................................................................. 14

ARGUMENT ...................................................................................................................... 18

    I.     The Court Lacks Subject Matter Jurisdiction over the Plaintiffs' Mandamus Claim and over Any Claims Based on the Submission of Inflated Charges by Other Hospitals. ......................................................................................................... 18

          A.     Standards for Consideration of a Motion to Dismiss for Lack of Subject Matter Jurisdiction. .................................................................................. 18

          B.     The Court Lacks Jurisdiction over the Plaintiffs' Mandamus Claim Seeking Payments from the Health Care Fraud and Abuse Control Account, Because the Plaintiffs Have No Clear Right to Any Payments from the Account.................................................................................... 19

          C.     The Plaintiffs Lack Standing to Pursue Any Claims Grounded in a Theory that HHS's Regulations Encouraged Other Hospitals to Falsely Inflate Their Charges. ..................................................................................... 20

    II.    The Plaintiffs' Complaint Fails to State a Claim. ................................................. 27

          A.     Standards for Consideration of a Motion to Dismiss............................... 27

          B.     The Plaintiffs' Mandamus Claim Is Not Cognizable. .............................. 28

          C.     The Plaintiffs Can Only Seek Judicial Review to Correct Specific Deficiencies in their Payments; the Plaintiffs Cannot Seek Wholesale Invalidation of HHS's Regulatory Program Based on the Program's Supposed Failure to Meet Abstract Goals................................................. 28

          D.     HHS's Approach to Preventing, Detecting, and Pursuing False Inflation of Charges by Other Hospitals Is Committed to Agency Discretion by Law and Is Not Subject to Judicial Review. ..................................................... 32

i

E.     The Plaintiffs' Various Challenges Against the Fixed Loss Thresholds Set by HHS Fail to State a Claim for Various Reasons. ................................. 35

1.     Submission of Inflated Charges by Other Hospitals Does Not Provide a Basis for Challenging the Fixed Loss Thresholds, Because HHS's Task When It Sets Fixed Loss Thresholds Is Simply to Predict the Total Payments that Will Be Made Given the Existing Regulatory Scheme. .............................................................................................. 36

2.     The Fact that Changes in Fixed Loss Thresholds Did Not Match Inflation Does Not Suggest that the Fixed Loss Thresholds Were Invalid, as Fixed Loss Thresholds Are Set Based on a Nationwide Budget Limit and Are Neither Expected Nor Required to Move in Step with Hospitals' Costs. ....................................................................... 39

3.     The Fact that Actual Payment Totals Did Not Exactly Match HHS's Projections Does Not Suggest that HHS's Predictive Methods Were Faulty and Does Not Make HHS's Fixed Loss Threshold Determinations Invalid. ...................................................................... 41

CONCLUSION .................................................................................................................. 44

## <u>TABLE OF AUTHORITIES</u>

**CASES**

<u>Abington Crest Nursing & Rehab. Ctr. v. Sebelius</u>,
    575 F.3d 717 (D.C. Cir. 2009) ........................................................................ 28, 31

<u>Allen v. Wright</u>,
    468 U.S. 737 (1984).......................................................................... 21, 23, 24, 27

<u>Alvin Lou Media, Inc. v. FCC</u>,
    571 F.3d 1 (D.C. Cir. 2009) ...................................................................... 34

<u>Am. Trucking Ass'ns v. U.S. Dep't of Transp.</u>,
    166 F.3d 374 (D.C. Cir. 1999) .................................................................. 34

<u>Ass'n of Irritated Residents v. EPA</u>,
    494 F.3d 1027 (D.C. Cir. 2007) .......................................................... 33, 34

<u>Astrue v. Ratliff</u>,
    130 S. Ct. 2521 (2010).............................................................................. 40

<u>Bell Atl. Corp. v. Twombly</u>,
    550 U.S. 544 (2007)................................................................................. 27

<u>Branton v. FCC</u>,
    993 F.2d 906 (D.C. Cir. 1993) .................................................................. 26

\* <u>Cnty. of Los Angeles v. Shalala</u>,
    192 F.3d 1005 (D.C. Cir. 1999) ................................................... passim

<u>DaimlerChrysler Corp. v. Cuno</u>,
    547 U.S. 332 (2006).................................................................................. 21

<u>Dynalantic Corp. v. Dep't of Def.</u>,
    115 F.3d 1012 (D.C. Cir. 1997)................................................................ 26

<u>EEOC v. St. Francis Xavier Parochial Sch.</u>,
    117 F.3d 621 (D.C. Cir. 1997).................................................. 19, 28, 43

<u>Found. on Econ. Trends v. Lyng</u>,
    943 F.2d 79 (D.C. Cir. 1991) .................................................................. 30

<u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>,
    528 U.S. 167 (2000)................................................................................. 21

<u>Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.</u>,
    460 F.3d 13 (D.C. Cir. 2006) .................................................................. 30

Good Samaritan Hosp. v. Shalala,
    508 U.S. 402 (1993) ........................................................................... 3

* Heckler v. Chaney,
    470 U.S. 821 (1985) ......................................................................... 33

Herbert v. Nat'l Acad. of Scis.,
    974 F.2d 192 (D.C. Cir. 1992) .......................................................... 18

* In re Cheney,
    406 F.3d 723 (D.C. Cir. 2005) (en banc) ..................................... 19, 20

Kaempe v. Myers,
    367 F.3d 958 (D.C. Cir. 2004) .......................................................... 43

Kokkonen v. Guardian Life Ins. Co. of Am.,
    511 U.S. 375 (1994) ..................................................................... 18, 19

Kowal v. MCI Commc'ns Corp.,
    16 F.3d 1271 (D.C. Cir. 1994) ...................................................... 27, 38

Lincoln v. Vigil,
    508 U.S. 182 (1993) ......................................................................... 34

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) ..................................................................... 21, 27

Lujan v. Nat'l Wildlife Fed'n,
    497 U.S. 871 (1990) ......................................................................... 29

Methodist Hosp. of Sacramento v. Shalala,
    38 F.3d 1225 (D.C. Cir. 1994) .......................................................... 34

Milk Train, Inc. v. Veneman,
    310 F.3d 747 (D.C. Cir. 2002) .......................................................... 38

Nat'l Med. Enters., Inc. v. Shalala,
    43 F.3d 691 (D.C. Cir. 1995) ............................................................ 31

* Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,
    366 F.3d 930 (D.C. Cir. 2004) .................................................. 24, 25, 26

North Carolina v. FERC,
    112 F.3d 1175 (D.C. Cir. 1997) ........................................................ 42

* Norton v. S. Utah Wilderness Alliance,
    542 U.S. 55 (2004) ..................................................................... 29, 31

Power v. Barnhart,
      292 F.3d 781 (D.C. Cir. 2002) ................................................................... 19

Price v. Socialist People's Libyan Arab Jamahiriya,
      294 F.3d 82 (D.C. Cir. 2002) .................................................................... 18

Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.,
      489 F.3d 1267 (D.C. Cir. 2007) ........................................................... 24, 25

* Simon v. E. Ky. Welfare Rights Org.,
      426 U.S. 26 (1976) .................................................................................... 23

St. Marks Place Hous. Co. v. U.S. Dep't of Hous. & Urban Dev.,
      610 F.3d 75 (D.C. Cir. 2010) .................................................................... 43

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
      127 S. Ct. 2499 (2007)................................................................. 19, 28, 43

* Tenn. Gas Pipeline Co. v. FERC,
      972 F.2d 376 (D.C. Cir. 1992) .................................................................. 34

Walter O. Boswell Mem'l Hosp. v. Heckler,
      749 F.2d 788 (D.C. Cir. 1984) .................................................................. 42

Warth v. Seldin,
      422 U.S. 490 (1975)................................................................................. 21

Wisconsin v. City of New York,
      517 U.S. 1 (1996)..................................................................................... 43

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. III ............................................................................... 18, 21

## FEDERAL STATUTES

42 U.S.C. § 1395f(i)(2)(B)....................................................................... 40

42 U.S.C. § 1395i(k)...................................................................... 3, 14, 20

42 U.S.C. § 1395x(v)(1)(A)...................................................................... 31

42 U.S.C. § 1395oo ......................................................................... passim

42 U.S.C. § 1395ww ........................................................................ passim

44 U.S.C. § 1507 .................................................................................. 19, 28

Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706 ................................. passim

Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1935 ..................................................................................................... 14

Mandamus and Venue Act, 28 U.S.C. § 1361 ................................................. 17, 18, 19, 28

Medicare Act, 42 U.S.C. § 1395 et seq. ............................................................................. 3

## FEDERAL REGULATIONS

42 C.F.R. §§ 412.80 to .86 ............................................................................... passim

## FEDERAL RULES

Fed. R. Civ. P. 12(b)(6) ................................................................................... 27

## OTHER AUTHORITIES

Black's Law Dictionary (9th ed. 2009) ............................................................ 39

Medicare Outlier Payments to Hospitals: Hearing Before a Subcomm. of the S. Comm. on Appropriations, 108th Cong. (2003) ............................................... 43

Medicare Program; Change in Methodology for Determining Payment for Extraordinarily High-Cost Cases (Cost Outliers) Under the Acute Care Hospital Inpatient and Long-Term Care Hospital Prospective Payment Systems, 68 Fed. Reg. 34,493 (June 9, 2003)................................................................................................. 13, 14

Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1998 Rates, 62 Fed. Reg. 45,965 (Aug. 29, 1997).................. 9, 10, 12

Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Rates and Costs of Graduate Medical Education: Fiscal Year 2002 Rates; Provisions of the Balanced Budget Refinement Act of 1999; and Provisions of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000, 66 Fed. Reg. 39,827 (Aug. 1, 2001).................................................. 8, 37, 40

Medicare Program; Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1989 Rates, 53 Fed. Reg. 38,476 (Sept. 30, 1988)................ 11, 12, 25

## PRELIMINARY STATEMENT

A provision of the Medicare Act allows a hospital participating in Medicare to request an additional "outlier" payment from Medicare when it treats an unusual case in which the hospital's estimated costs exceed the standard Medicare payment by more than a certain dollar amount. This dollar-amount cutoff point, the "fixed loss threshold," is set every year by the Department of Health and Human Services (HHS) based on the projected total of payments that HHS expects to make to all hospitals. See 42 U.S.C. § 1395ww(d)(5)(A)(ii)–(iv). The plaintiffs in this action claim that from fiscal year 1998 to fiscal year 2006, they received fewer and lower outlier payments than they should have, either because their payments were indirectly affected by falsely padded charges submitted by other hospitals or because HHS set the fixed loss threshold improperly. The Court should dismiss this action, because the Court cannot grant relief against HHS based on fraud or similar misconduct by other hospitals or any supposed deficiencies in HHS's efforts to prevent fraud and abuse, and the allegations of the plaintiffs' complaint do not point to anything that can be considered a defect in HHS's procedures.

The plaintiffs cannot bring claims against HHS based on fraud or similar misconduct committed by other hospitals who are not parties or perceived shortcomings in HHS's efforts to prevent and control fraud, for at least two reasons. First, the jurisdictional requirement of standing demands that a plaintiff demonstrate that its injury is fairly traceable to actions by the defendant. This means the plaintiffs cannot bring claims against HHS based on misconduct by other hospitals or based on speculative assumptions about how those other hospitals would have acted if HHS had implemented different policies. Second, the Administrative Procedure Act, 5 U.S.C. § 701(a)(2), prohibits review of matters committed to agency discretion by law, including decisions about the timing and manner of an agency's efforts to control fraud. Such decisions

involve difficult judgments about resource allocation and regulatory priorities, and there are no judicially manageable standards that a court could apply in reviewing such decisions.

The plaintiffs also cannot ask the Court to set aside HHS's regulatory program as a whole based on HHS's supposed failure to meet broad, abstract objectives such as providing sufficient "financial protection" to hospitals or ensuring that funds go to "the right hospitals" and not to "the wrong hospitals." The provision of the Medicare Act that authorizes judicial review in this case, 42 U.S.C. § 1395oo(f)(1), only authorizes review of specific final decisions of the Secretary; it does not permit a generalized attack on the entire outlier payment program based on its failure to achieve abstract goals.

The plaintiffs also cannot prevail on their claims specifically challenging HHS's determinations of the fixed loss thresholds for the years at issue, because none of the plaintiffs' objections to those determinations actually describes anything that can be considered an error by HHS. Even if the Court could find legal error in HHS's rules for determining outlier payments based on hospitals' charges, that would not mean that HHS acted improperly when it used data on past hospital charges to make projections about the levels of payments that would be made under those payment rules. Whether HHS made valid projections about its future payments depends on whether HHS used reasonable predictive methods, not on the relative merits of the payment scheme.

The fact that changes to the fixed loss threshold each year did not match inflation also does not amount to error. The statute specifies that HHS is to reset the fixed loss threshold each year based on a nationwide budget constraint determined by HHS's payment projections. There is no guarantee and no reason to expect that the fixed loss threshold will remain constant in

inflation-adjusted terms from year to year, or that the fixed loss threshold will represent a constant proportion of a hospital's costs from year to year.

HHS also has no obligation to reset the fixed loss thresholds retroactively either to account for differences between its annual payment projections and the actual payments eventually made, or to account for amounts recovered from hospitals that submitted falsely padded charges to Medicare. The D.C. Circuit established in <u>County of Los Angeles v. Shalala</u>, 192 F.3d 1005 (D.C. Cir. 1999), that HHS is only required to set fixed loss thresholds based on reasonable projections. HHS need not readjust fixed loss thresholds later simply because its projections did not perfectly predict future events.

Finally, the plaintiffs' claim seeking mandamus to compel HHS to pay them funds from the Health Care Fraud and Abuse Control Account can be dismissed out of hand. Neither the statute cited by the plaintiffs, 42 U.S.C. § 1395i(k)(2)(C), nor any other provision of law even arguably entitles the plaintiffs to funds from this account, so the mandamus claim must be dismissed for lack of subject matter jurisdiction and for failure to state a claim.

Accordingly, the Court should dismiss the plaintiffs' complaint.

## BACKGROUND

### I.    Statutory and Regulatory Background

#### A.    Medicare Outlier Payments

The Medicare program, established under title XVIII of the Social Security Act of 1935, 42 U.S.C. § 1395 <u>et seq.</u>, provides federally funded medical insurance to elderly and disabled persons. Medicare sets out a "complex statutory and regulatory regime," <u>Good Samaritan Hosp. v. Shalala</u>, 508 U.S. 402, 404 (1993), under which hospitals can obtain payment from the Medicare program for services that they provide to patients covered by Medicare.

The Medicare program generally does not reimburse hospitals for the actual costs of the care they provide. Instead, hospitals are paid at fixed rates under a scheme known as the Prospective Payment System (PPS). See Cnty. of Los Angeles v. Shalala, 192 F.3d 1005, 1008 (D.C. Cir. 1999). HHS defines categories of medical conditions known as "diagnosis related groups" (DRGs). See id. For each DRG, HHS determines a standard payment amount, the "DRG prospective payment rate," intended to reflect the estimated average cost of treating a patient whose condition falls within that DRG. See id. at 1008–09. For each case that a hospital treats, Medicare generally pays the hospital the DRG prospective payment rate that corresponds to the patient's diagnosis, even though the actual cost the hospital incurs in treating that patient may be much higher or lower than the DRG prospective payment rate. Consequently, a hospital stands to come out ahead financially each time it treats a case in which its costs fall below the DRG prospective payment rate, but stands to lose financially each time it treats a case in which its costs exceed the DRG prospective payment rate.

A hospital's gains and losses may even out over numerous cases, or they may not. A hospital that incurs lower-than-average costs in a great many cases may experience large net gains, while a hospital that incurs higher-than-average costs in a large number of cases—whether because the hospital operates inefficiently or merely because it has run into a string of unusually complicated cases—may face losses. Payments generally are not adjusted to reflect ordinary variations of this kind. However, to lessen the financial blow that rare, exceptionally costly cases might impose on hospitals, Congress has provided for additional "outlier" payments to partly offset extremely high costs in some rare cases. Outlier payments are governed by 42 U.S.C. § 1395ww(d)(5)(A), which provides:

> (ii) . . . [A hospital paid under the PPS] may request additional payments
> in any case where charges, adjusted to cost, . . . exceed the sum of the applicable

DRG prospective payment rate plus any amounts payable under subparagraphs (B) and (F) plus a fixed dollar amount determined by the Secretary.

(iii) The amount of such additional payment . . . shall be determined by the Secretary and shall . . . approximate the marginal cost of care beyond the cutoff point applicable under clause . . . (ii).

Id. § 1395ww(d)(5)(A)(ii)–(iii). HHS has promulgated regulations implementing

§ 1395ww(d)(5)(A) at 42 C.F.R. §§ 412.80 to .86.

Whether a case is eligible for an outlier payment depends on the approximate actual cost the hospital has incurred in treating that case, including both capital costs and operating costs.[1] A hospital's exact costs for a given case cannot be readily discerned, so the statute specifies that HHS is to estimate a hospital's costs based on the charges the hospital has billed for covered services in the case. See 42 U.S.C. § 1395ww(d)(5)(A)(ii) ("charges, adjusted to cost"). Each fiscal year, HHS determines a "fixed dollar amount," id., that is to serve as a "cutoff point," id. § 1395ww(d)(5)(A)(iii), also known as the "fixed loss threshold." If a hospital's estimated costs for a case exceed the sum of the DRG prospective payment rate and the fixed loss threshold,[2] then the case is eligible for an outlier payment. See id. § 1395ww(d)(5)(A)(ii); 42 C.F.R. § 412.80(a)(2) (1997); 42 C.F.R. § 412.80(a)(2) (2001); 42 C.F.R. § 412.80(a)(2)–(3) (2002).[3]

---

[1] Before fiscal year 1997, the statute also authorized a second category of outlier payments based on the length of the patient's stay in the hospital. See 42 U.S.C. § 1395ww(d)(5)(A)(i). These "day outlier" payments are not at issue in this litigation. See First Am. Compl. ¶ 52 n.2.

[2] The sum of the DRG prospective payment rate and the fixed loss threshold is sometimes known as the "outlier threshold." This memorandum attempts to avoid using the term "outlier threshold" in light of its confusing similarity to the term "fixed loss threshold."

[3] For the sake of simplicity, this discussion disregards two details of the calculation of outlier payments that do not appear to be in dispute in this case:

First, hospitals may receive certain add-on payments on top of the DRG prospective payment rate for indirect costs of graduate medical education, 42 U.S.C. § 1395ww(d)(5)(B), for serving a disproportionate share of low-income patients, id. § 1395ww(d)(5)(F), or for the costs of new medical services and technologies, id. § 1395ww(d)(5)(K). Any such payments are added to the DRG prospective payment rate in the calculation that determines whether a given case (continued . . .)

The amount of the outlier payment is "determined by the Secretary" and is to "approximate the marginal cost of care beyond the cutoff point." 42 U.S.C. § 1395ww(d)(5)(A)(iii). This means the outlier payment is to reflect the amount by which the estimated cost of treating the case exceeds the sum of the DRG prospective payment rate and the fixed loss threshold. Essentially, the fixed loss threshold represents the dollar amount of loss that a hospital must absorb on its own in any case in which the hospital incurs costs greater than the DRG prospective payment rate—hence the term "fixed loss threshold." In any given case, the hospital must always absorb any loss up to the fixed loss threshold, but if the hospital faces a loss greater than the fixed loss threshold, the hospital will receive outlier payments proportionate to the amount by which the hospital's loss exceeds the fixed loss threshold. During the time period at issue in this case, HHS's regulations generally provided for outlier payments equal to 80 percent of any difference between the hospital's loss and the fixed loss threshold. See 42 C.F.R. § 412.84(j) (1997); 42 C.F.R. § 412.84(k) (2003).

To illustrate, suppose that in fiscal year 1998, a hospital incurred an estimated cost of $72,000 in treating a Medicare-covered patient who required a pituitary procedure.[4] In fiscal year 1998, the applicable DRG for adrenal and pituitary procedures was DRG 286, and the standard payment from Medicare for cases in that DRG was $8,002.49. The fixed loss threshold set by HHS for fiscal year 1998 was $11,050. To determine whether the case is eligible for an outlier

---

qualifies for an outlier payment. See id. § 1395ww(d)(5)(A)(ii) (referring to "amounts payable under subparagraphs (B) and (F)"); 42 C.F.R. § 412.80(a)(2) (2001); 42 C.F.R. § 412.80(a)(2)–(3) (2002).

Second, the fixed loss threshold is also adjusted by a local wage index to account for geographic variations in costs. See 42 C.F.R. § 412.80(a)(2) (1997); 42 C.F.R. § 412.80(a)(2) (2001); 42 C.F.R. § 412.80(a)(2)–(3) (2002); see also First Am. Compl. ¶ 41.

[4] The figures in this illustration are taken from an August 29, 1997, Federal Register notice. Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1998 Rates, 62 Fed. Reg. 45,965, 45,997–98 (Aug. 29, 1997).

payment, HHS calculates the sum of the $8,002.49 DRG payment and the $11,050 fixed loss threshold, which works out to $19,052.49. Because the hospital's estimated costs of $72,000 exceed the $19,052.49 figure, the case is eligible for an outlier payment. To determine the amount of the outlier payment, HHS calculates the difference between the hospital's estimated costs of $72,000 and the $19,052.49 figure, which works out to $52,947.51. The hospital will receive an outlier payment equal to 80 percent of the $52,947.51 difference. Rounding to the nearest cent, this produces an outlier payment of $42,358.01.

Another way to look at this calculation is to follow what portions of the hospital's costs are absorbed by the hospital as losses and what portions are compensated by Medicare payments. Without any outlier payments, the hospital in this illustration would lose $63,997.51 from treating the case—the difference between the hospital's estimated costs of $72,000 and the $8,002.49 DRG payment from Medicare. The hospital must absorb all losses up to the fixed loss threshold; that is, the hospital must absorb all of the first $11,050 of the $63,997.51 loss. Of the remaining $52,947.51 of loss, 80 percent will be compensated by an outlier payment, and 20 percent will be absorbed by the hospital. So the $52,947.51 breaks down into $42,358.01 for which the hospital receives a Medicare outlier payment and $10,589.50 that the hospital must absorb as a loss. The total losses absorbed by the hospital comprise the fixed loss threshold amount, $11,050, plus 20 percent of the hospital's loss above the fixed loss threshold, $10,589.50—$21,639.50 in all.

As noted above, § 1395ww(d)(5)(A)(ii) specifies that the fixed loss threshold is to be "determined by the Secretary." Id. The only constraint on HHS's determination of the fixed loss threshold is set out in § 1395ww(d)(5)(A)(iv):

> (iv) The total amount of the additional payments made under this subparagraph for discharges in a fiscal year may not be less than 5 percent nor

> more than 6 percent of the total payments projected or estimated to be made based
> on DRG prospective payment rates for discharges in that year.

Id. Under HHS's interpretation of this provision, which was considered and upheld by the D.C.

Circuit in County of Los Angeles v. Shalala, 192 F.3d 1005 (D.C. Cir. 1999), HHS must set the

fixed loss threshold in advance of each fiscal year based on projections it makes about aggregate

payments to hospitals: HHS must first make a projection estimating the overall total of ordinary

payments the Medicare program will make in the coming fiscal year based on DRG prospective

payment rates. HHS must also make a prediction about the patterns in which per-case costs will

happen to fall relative to DRG prospective payment rates. HHS must then set the fixed loss

threshold high enough that the overall total of predicted outlier payments does not exceed 6

percent of the predicted total of payments based on DRG prospective payment rates, but low

enough that the overall total of predicted outlier payments amounts to at least 5 percent of the

projected total of payments based on DRG prospective payment rates. See Cnty. of Los Angeles,

192 F.3d at 1013, 1020 (discussing HHS's interpretation of § 1395ww(d)(5)(A)(iv) and

upholding it as a reasonable interpretation of the statutory language). In each of the fiscal years

at issue in this case, the Secretary set fixed loss thresholds so that predicted total outlier

payments would equal 5.1 percent of the predicted total of payments based on DRG prospective

payment rates. See First Am. Compl. ¶ 46.

HHS determines the appropriate level for the fixed loss threshold by calculating

simulated payments based on past charges: HHS takes historical data on charges actually

submitted by hospitals, updates the data to account for inflation, feeds the inflation-adjusted data

into the current payment calculation mechanism, and tallies the simulated payments that result

when the fixed loss threshold is set at different possible levels. See, e.g., Medicare Program;

Changes to the Hospital Inpatient Prospective Payment Systems and Rates and Costs of Graduate

Medical Education: Fiscal Year 2002 Rates; Provisions of the Balanced Budget Refinement Act
of 1999; and Provisions of the Medicare, Medicaid, and SCHIP Benefits Improvement and
Protection Act of 2000, 66 Fed. Reg. 39,827, 39,941 (Aug. 1, 2001) ("To calculate the final FY
2002 outlier thresholds, we simulated payments by applying FY 2002 rates and policies to the
March 2001 update of the FY 2000 MedPAR file and the March 2001 update of the Provider-
Specific File."); see also First Am. Compl. ¶ 126 (quoting Medicare Program; Changes to the
Hospital Inpatient Prospective Payment Systems and Fiscal Year 1997 Rates, 61 Fed. Reg.
27,443, 27,496 (May 31, 1996)).

The D.C. Circuit explained in County of Los Angeles that the statute does not require
HHS to ensure that the actual total of outlier payments made in a fiscal year ultimately matches
up with its earlier projections for that fiscal year. If it later turns out that the actual total of outlier
payments made in a given fiscal year does not fall between 5 percent and 6 percent of the actual
total of payments made based on DRG prospective payment rates, HHS has no obligation to
change the fixed loss threshold for the fiscal year or recalculate outlier payments using a revised
fixed loss threshold. See Cnty. of Los Angeles, 192 F.3d at 1013, 1020. So if actual outlier
payments ultimately add up to less than 5 percent of actual payments based on DRG prospective
payment rates, HHS does not make additional outlier payments to bring the total up to 5 percent.
Likewise, if actual outlier payments add up to more than 6 percent of actual payments based on
DRG prospective payment rates, HHS does not require hospitals to refund outlier payments to
the Hospital Insurance Trust Fund to bring the total down to 6 percent. See id. at 1019–20;
Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal
Year 1998 Rates, 62 Fed. Reg. 45,965, 46,011 (Aug. 29, 1997) ("[O]nce the payment parameters
and adjustments are established for a fiscal year, we do not make retroactive adjustments based

on differences between estimated and actual payments, whether actual payments are higher or lower than estimated payments.").

To offset the cost of outlier payments, 42 U.S.C. § 1395ww(d)(3)(B) provides that ordinary payments based on DRG prospective payment rates are to be reduced by a percentage equal to HHS's target percentage for outlier payments. See id. The amounts subtracted from hospital payments under § 1395ww(d)(3)(B) are sometimes colloquially described as funding an "outlier pool" from which outlier payments are made. See, e.g., First Am. Compl. ¶¶ 43–45, 179. However, the "outlier pool" does not actually exist as a discrete pool of funds. The amounts subtracted from ordinary Medicare payments under § 1395ww(d)(3)(B) are not actually set aside or earmarked for outlier payments, and outlier payments are neither drawn from nor limited to the amount of funds subtracted from ordinary payments under § 1395ww(d)(3)(B). Rather, a hospital's outlier payments are made out of the Hospital Insurance Trust Fund based strictly on the applicable fixed loss threshold and the hospital's estimated costs. The total amount of outlier payments in any given year may be—and indeed, almost certainly will be—either greater than or less than the total amount of funds subtracted from payments under § 1395ww(d)(3)(B). See generally Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1998 Rates, 62 Fed. Reg. 45,965, 46,011 (Aug. 29, 1997) ("We do not set aside a pool of money to fund outlier cases. Moreover, once the payment parameters and adjustments are established for a fiscal year, we do not make retroactive adjustments based on differences between estimated and actual payments, whether actual payments are higher or lower than estimated payments.").

**B.**  **Past Abuses of the Outlier Payment System and 2003 Refinements to the Outlier Payment System**

As explained above, Congress directed in 42 U.S.C. § 1395ww(d)(5)(A)(ii) that HHS is to determine the costs a hospital has incurred for a given case by estimating the hospital's costs based on the charges the hospital has billed for that case. See id. (providing for outlier payments based on "charges, adjusted to cost"). The statutory scheme thus relies on a basic assumption that a hospital's billed charges will generally bear a reasonable and predictable relationship to the costs incurred by the hospital. Unfortunately, in some past years, some hospitals participating in Medicare exploited this feature of the outlier payment system to obtain greater outlier payments. These hospitals simply padded their billed charges, which made it appear that they were incurring greater costs and were entitled to greater outlier payments.

HHS has periodically refined the outlier payment scheme to curb abusive charging practices and ensure that cost estimates based on billed charges more accurately reflect hospitals' actual costs. HHS estimates a hospital's costs for a case by multiplying its billed charges by a "cost-to-charge" ratio, a fraction that represents the estimated amount that a hospital incurs in costs for every dollar that the hospital bills in charges. Before 1988, HHS estimated a hospital's costs for a case by simply multiplying its billed charges by a standard cost-to-charge ratio of 0.66. HHS used that same cost-to-charge ratio for every hospital nationwide—essentially, the system assumed that on average, a hospital's costs would equal roughly 66 percent of its charges. See Medicare Program; Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1989 Rates, 53 Fed. Reg. 38,476, 38,502 (Sept. 30, 1988).

The actual relationship between charges and costs may, of course, vary considerably among hospitals—some hospitals' charges may be comparatively higher in relation to their costs, and other hospitals' charges may be comparatively lower in relation to their costs. In 1988, to

11

better account for this kind of variation, HHS refined the regulations so that each hospital's costs would be estimated from its charges based on a cost-to-charge ratio calculated individually for that hospital based on historical cost and charge data contained in reports the hospital had submitted to Medicare. See id. at 38,503 ("Hospital Specific Cost-to-Charge Ratios"); 42 C.F.R. § 412.84(h) (1988). Each hospital's cost-to-charge ratio was recalculated each year using the cost and charge data contained in the most recent finally settled cost report submitted by the hospital. See 53 Fed. Reg. at 38,503. HHS acknowledged that a hospital's most recent finally settled cost report might be a few years old, and that data contained in a hospital's most recently filed cost report would be more up to date. See id. at 38,507. But past experience had shown that "Medicare costs [were] generally overstated on the filed cost report[s]" submitted by hospitals and that cost figures were often "subsequently reduced as a result of audit" before cost reports were finally settled. Id. HHS therefore concluded that data from the most recently settled cost report would be more reliable overall than data in a more recent cost report that had not yet been reviewed. See id. The 1988 rule further provided that hospitals that had not previously filed cost reports would have their cost-to-charge ratios set based on statewide averages. See id. at 38,503; 42 C.F.R. § 412.84(h) (1988). To reduce the risk of error due to faulty data reporting or entry, HHS also specified that the statewide average would also apply to hospitals whose calculated cost-to-charge ratios were extremely high or extremely low.[5] See 53 Fed. Reg. at 38,503; see also 42 C.F.R. § 412.84(h) (1988).

---

[5] The details are not relevant to this motion, but to be specific, the statewide average ratio would apply if the hospital's computed cost-to-charge ratio was more than three standard deviations above or below the geometric mean of all hospitals' cost-to-charge ratios. See 53 Fed. Reg. at 38,503; see also, e.g., Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1998 Rates, 62 Fed. Reg. 45,965, 46,041 (Aug. 29, 1997).

In 2003, HHS further refined the system in response to the emergence of abusive charging practices by some hospitals. First, HHS provided that a "tentative settled" cost report—a cost report that has undergone some preliminary review, but has not yet been finally settled—would be used to calculate a hospital's cost-to-charge ratio if the tentative settled cost report contained more recent data than the hospital's most recent finally settled cost report. See Medicare Program; Change in Methodology for Determining Payment for Extraordinarily High-Cost Cases (Cost Outliers) Under the Acute Care Hospital Inpatient and Long-Term Care Hospital Prospective Payment Systems, 68 Fed. Reg. 34,493, 34,497–99 (June 9, 2003) ("The tentative settlement is a cursory review of the filed cost report to determine the amount of payment to be paid to the hospital if an amount is due on the as-filed cost report. After the cost report is tentatively settled, it can take 12 to 24 months, depending on the type of review or audit, before the cost report is final-settled."); 42 C.F.R. § 412.84(i)(2) (2003). Second, HHS changed its regulations so that statewide average cost-to-charge ratios would be used only for hospitals whose computed cost-to-charge ratios were extremely high, and would no longer be used for hospitals whose computed cost-to-charge ratios were extremely low. See 68 Fed. Reg. at 34,499–500; 42 C.F.R. § 412.84(i)(3) (2003). Both of these changes were designed to ensure that the calculation of a hospital's cost-to-charge ratio each year would keep pace with recent changes in the proportional relationship between hospitals' charges and their costs. See 68 Fed. Reg. at 34,497–500.

While these two changes were intended to reduce the effects of padded charges, HHS recognized that they would not totally eliminate any incentive to pad charges. Because cost-to-charge ratios are always calculated from past data, but are applied to current data, there will always be some delay before any unwarranted increase in a hospital's charges is reflected in the

hospital's cost-to-charge ratio. See id. at 34,501–02. As a further check against abuse, HHS's

2003 regulations additionally provided that outlier payments for a hospital could later be revised

based on the cost and charge data contained in the hospital's final settled cost report. See id. at

34,500–02; 42 C.F.R. § 412.84(i)(3), (m) (2003).

     HHS has also sought to recover past outlier payments made to hospitals based on

improperly inflated charges, and the Federal Government has also taken action against

overcharging hospitals through other avenues. See First Am. Compl. ¶¶ 15, 163, 165. Some of

these efforts have resulted in settlements in which certain hospitals agreed to make payments to

the United States to settle allegations related to inflated claims for outlier payments. See First

Am. Compl. ¶¶ 15, 165.

### C.    The Health Care Fraud and Abuse Control Account

     The Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191,

110 Stat. 1935, established an expenditure account within the Hospital Insurance Trust Fund

called the Health Care Fraud and Abuse Control Account. Id. § 201(b), 110 Stat. at 1993–96

(codified as amended at 42 U.S.C. § 1395i(k)). The funds in the Health Care Fraud and Abuse

Control Account are intended to be used for certain activities related to fraud and abuse control,

including civil, criminal, or administrative prosecutions related to fraud and abuse;

investigations; financial and performance audits of health care programs and operations;

inspections and other evaluations; and provider and consumer education. See 42 U.S.C.

§ 1395i(k)(3)–(4).

## II.    Factual Background

     The plaintiffs in this action own and operate 29 hospitals that participate in the Medicare

program. First Am. Compl. ¶¶ 1, 22. The plaintiffs are challenging the amounts of outlier

payments they received for services provided between fiscal year 1998 and fiscal year 2006. See

First Am. Compl. ¶¶ 1, 22. The plaintiffs' complaint states that the plaintiffs have been shortchanged by some $350 million, though the complaint does not explain how the plaintiffs arrived at this figure. See First Am. Compl. ¶ 17.

The plaintiffs brought various appeals before the Provider Reimbursement Review Board and requested expedited judicial review in those appeals.[6] First Am. Compl. ¶¶ 20, 191–193, 195–196. The Provider Reimbursement Review Board authorized expedited judicial review in these appeals in notices dated July 23, 2010, and October 26, 2010. First Am. Compl. ¶¶ 194– 195 and Exs. A, B; see 42 U.S.C. § 1395oo(f)(1). The plaintiffs initially filed suit in this Court on September 27, 2010. Compl. On December 23, 2010, the plaintiffs filed a First Amended Complaint asserting the same claims as the initial complaint and also adding one of the plaintiffs' fiscal year 1999 payments to the dispute. First Am. Compl.

The plaintiffs' complaint contains two numbered counts. The first numbered count asserts a claim for judicial review under the Medicare Act, 42 U.S.C. § 1395oo(f)(1), generally asserting that HHS's regulations governing outlier payments were inconsistent with the statute, were arbitrary and capricious, and were enforced in an arbitrary and capricious manner. See First Am. Compl. ¶¶ 197–198. The complaint appears to comprise numerous overlapping alternative claims. All of these claims rely on some combination of three main assertions:

First, the plaintiffs appear to claim that HHS failed to build sufficient safeguards against abuse into the methods it prescribed for estimating charges based on costs, and failed to police hospitals' charges to ensure that they were in line with their costs. According to the plaintiffs,

---

[6] The defendant acknowledges that the plaintiffs filed appeals before the Provider Reimbursement Review Board but does not concede that all of the specific claims in the First Amended Complaint were timely and properly raised and exhausted in administrative proceedings.

this set off a chain of events that led to lower payments for the plaintiffs in future years. As the plaintiffs tell it, if HHS had put a different system in place, or if it had policed hospital charges more vigorously, hospitals would have been more wary of submitting charges that were out of line with their costs. Aggregate hospital charge data in a given fiscal year then would have reflected a pattern of lower charges in general. Later, when HHS made projections of future total outlier payments based on past aggregate hospital charge data, HHS would have predicted lower overall outlier payments for any given value of the fixed loss threshold. According to the plaintiffs, HHS therefore would have set lower fixed loss thresholds to meet its goal of placing predicted total outlier payments between 5 and 6 percent of total payments based on DRG prospective payment amounts. This would have meant greater outlier payments for the plaintiffs. See First Am. Compl. ¶¶ 3–6, 8–11, 13–14, 16–18, 48–51, 53–55, 63–124, 128, 149–150, 161, 167, 189.

Second, the plaintiffs argue that HHS failed to accomplish certain broad objectives that they describe as the intended goals of the outlier payment system, such as providing the plaintiffs and other hospitals "financial protection" from potential losses, see First Am. Compl. ¶¶ 2–3, 5, 16, 51, 82, 121, 127, 175–176; ensuring that all hospitals received what the plaintiffs consider a fair share of all the outlier payments made, see First Am. Compl. ¶¶ 3–5, 114, 121–122, 167, 170, 190; and eliminating fraud and waste, see First Am. Compl. ¶¶ 3–6, 8–11, 13–14, 16–18, 48–51, 53–55, 63–124, 128, 149–150, 161. The plaintiffs argue that in light of these supposed failures, HHS's entire regulatory scheme is invalid and the Court must order HHS to create an entirely new regulatory program from scratch and apply it retroactively to the fiscal years at issue. See First Am. Compl. ¶ 21 and at 56–57.

Third, the plaintiffs argue that the fixed loss thresholds determined by HHS for the fiscal years at issue were invalid for one of several alternative reasons: First, the plaintiffs argue, the fixed loss thresholds may have been invalid because HHS set the fixed loss thresholds based on simulations that incorporated historical data containing fraudulent charges by other hospitals. See First Am. Compl. ¶¶ 16, 18, 124–125, 128, 149–153, 161, 167. Alternatively, the plaintiffs argue, the fixed loss thresholds may have been invalid because changes to the fixed loss threshold from year to year did not closely correspond to inflation or to changes in hospitals' costs. See First Am. Compl. ¶¶ 14, 129–148, 155–158, 161, 175–176. A third possibility, the plaintiffs contend, is that HHS should be required to readjust the fixed loss thresholds for past fiscal years to account for subsequent events—either to account for differences between the amounts HHS projected it would pay in each fiscal year and the amounts HHS actually paid out later, see First Am. Compl. ¶¶ 47, 159, 161, or to account for amounts that have been recovered from hospitals that submitted falsely padded charges to Medicare, see First Am. Compl. ¶¶ 162–174.

The plaintiffs seek relief that would entail invalidation of HHS's outlier payment regulations and the "pattern of enforcement" of those regulations, recalculation of the fixed loss thresholds for the fiscal years at issue "based upon a generally accepted index for cost inflation," and readjustment of the hospitals' outlier payments for the fiscal years at issue based on the recalculated fixed loss thresholds. See First Am. Compl. ¶ 21 and at 56–57.

The second numbered count of the plaintiffs' complaint asserts a claim under the Mandamus and Venue Act, 28 U.S.C. § 1361, seeking mandamus to compel HHS to transfer funds to the plaintiffs from the Health Care Fraud and Abuse Account. See First Am. Compl. ¶¶ 19, 21, 177–187, 199–204 and at 57.

## ARGUMENT

I.    **The Court Lacks Subject Matter Jurisdiction over the Plaintiffs' Mandamus Claim and over Any Claims Based on the Submission of Inflated Charges by Other Hospitals.**

This Court lacks subject matter jurisdiction over the plaintiffs' claim under the Mandamus and Venue Act, 28 U.S.C. § 1361, because the plaintiffs have no clear right to payments from the Health Care Fraud and Abuse Control Account. This Court also lacks subject matter jurisdiction over any claims that seek to hold Medicare accountable for any consequences that ensued from submission of falsely inflated charges by hospitals other than the plaintiff hospitals. Those claims fail to satisfy the constitutional requirement of standing, because the chain of causation linking the amounts of the plaintiffs' outlier payments back to the misconduct of those other hospitals and ultimately back to HHS's regulatory actions is simply too tenuous and too speculative to meet the demands of Article III of the Constitution. Even if the Court could accept the plaintiffs' hypothesis that excessive charges by other hospitals ultimately led to lower outlier payments for the plaintiffs, HHS is not responsible for those other hospitals' misconduct, and there is no way for the Court to tell whether those hospitals would have acted differently under some other regulatory scheme.

### A.    Standards for Consideration of a Motion to Dismiss for Lack of Subject Matter Jurisdiction.

The party that seeks to invoke federal court jurisdiction—in this case, the plaintiffs—bears the burden of establishing jurisdiction. See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). When a defendant asserts that the allegations in the plaintiff's complaint are legally insufficient to invoke the court's jurisdiction, the court considers the same materials that it would consider on a motion to dismiss for failure to state a claim. See Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C. Cir. 2002); Herbert v. Nat'l

Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992). This means that the Court may consider "the

facts alleged in the complaint, any documents either attached to or incorporated in the complaint

and matters of which [the Court] may take judicial notice." EEOC v. St. Francis Xavier Parochial

Sch., 117 F.3d 621, 624 (D.C. Cir. 1997); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.,

127 S. Ct. 2499, 2509 (2007). That includes any notices issued by HHS in the Federal Register.

44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . .").

> **B.** **The Court Lacks Jurisdiction over the Plaintiffs' Mandamus Claim Seeking Payments from the Health Care Fraud and Abuse Control Account, Because the Plaintiffs Have No Clear Right to Any Payments from the Account.**

This Court lacks jurisdiction over the plaintiffs' request for mandamus to compel

payments from the Health Care Fraud and Abuse Control Account, because the plaintiffs cannot

show that they have any right to such payments, let alone the kind of "clear and indisputable"

right required to invoke the Court's mandamus jurisdiction.

A Court's subject matter jurisdiction extends only as far as Congress has authorized by

statute, and the plaintiffs bear the burden of establishing that jurisdiction is authorized. See

Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). The Mandamus and

Venue Act, 28 U.S.C. § 1361, authorizes district court jurisdiction over actions "in the nature of

mandamus." Id. The D.C. Circuit, sitting en banc, has explained that:

> Jurisdiction over actions 'in the nature of mandamus" under § 1361, like
> jurisdiction over the now-abolished petitions for writs of mandamus, is strictly
> confined. . . . [M]andamus is "drastic"; it is available only in "extraordinary
> situations"; it is hardly ever granted; those invoking the court's mandamus
> jurisdiction must have a "clear and indisputable" right to relief; and even if the
> plaintiff overcomes all these hurdles, whether mandamus relief should issue is
> discretionary.

In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc); see also Power v. Barnhart, 292 F.3d

781, 784 (D.C. Cir. 2002) ("Mandamus is available only if: '(1) the plaintiff has a clear right to

relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy

available to plaintiff.'"). Because mandamus jurisdiction is available only in cases where the

remedy requested is in the nature of mandamus, "mandamus jurisdiction under § 1361 merges

with the merits." Cheney, 406 F.3d at 729.

Mandamus jurisdiction is unavailable in this case because the statutory provision that the

plaintiffs rely on, 42 U.S.C. § 1395i(k)(2)(C), does not grant them any right, much less a clear

right, to payments from the Health Care Fraud and Abuse Control Account. There is simply no

way § 1395i(k)(2)(C) can be read as entitling the plaintiffs to payments from the Health Care

Fraud and Abuse Control Account. The cited provision provides that amounts matching certain

penalties and damages obtained under the False Claims Act, "other than funds awarded to a

relator, for restitution or otherwise authorized by law," must be deposited in the Federal Hospital

Insurance Trust Fund. Id. The provision does not say anything about the Health Care Fraud and

Abuse Control Account or any payments from that account. It certainly does not require any

payment of funds from the Health Care Fraud and Abuse Control Account to the plaintiffs in

particular. The Court should dismiss the plaintiffs' mandamus claim for lack of subject matter

jurisdiction.

     **C.**    **The Plaintiffs Lack Standing to Pursue Any Claims Grounded in a Theory that HHS's Regulations Encouraged Other Hospitals to Falsely Inflate Their Charges.**

The plaintiffs lack standing to assert any claims that attempt to trace the level of the

plaintiffs' outlier payments back to perceived weaknesses in HHS's regulatory scheme that

supposedly made it easier for other hospitals to falsely pad their charges, see First Am. Compl.

¶¶ 3–6, 8–11, 13–14, 16–18, 48–51, 53–55, 63–124, 128, 149–150, 161, 167, 189. Those other

hospitals decided on their own to falsely inflate their charges. HHS cannot be held responsible

for their misconduct, and there is no way for the Court to determine whether or how those other

hospitals' behavior would have differed under some other supposedly superior regulatory scheme.

The constitutional separation of powers, as embodied in Article III of the Constitution, restricts the subject matter jurisdiction of the federal courts to the resolution of specific "'cases' and 'controversies'" and prevents courts from taking action to address matters better suited to legislative or executive action. Allen v. Wright, 468 U.S. 737, 750 (1984). One manifestation of this "case or controversy" limitation is the requirement of "standing," which demands that any plaintiff in federal court show a sufficient "personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth v. Seldin, 422 U.S. 490, 498–99 (1975) (internal quotation mark omitted). Standing entails three elements:

> [A] plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000). The plaintiff bears the burden of establishing each of these three elements. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Also, when a plaintiff asserts multiple claims, the plaintiff must show that each individual claim independently satisfies the requirements; establishing standing for one claim in the case does not excuse the plaintiff from having to establish standing for other claims. See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 351–53 (2006) (explaining that "a plaintiff must demonstrate standing for each claim he seeks to press" and rejecting the notion that establishing standing for a single claim makes it unnecessary for a plaintiff to establish standing for other claims based on the same facts).

As explained above, the plaintiffs' claim for judicial review under 42 U.S.C. § 1395oo(f)(1) appears to comprise various alternative claims based on a jumble of alternative theories. One of these theories posits that weaknesses in HHS's regulatory scheme encouraged hospitals to falsely submit charges that were out of line with their costs in hopes of obtaining greater outlier payments than they would otherwise receive. The plaintiffs assert that if HHS's regulatory scheme had been more robust, or if HHS had done a better job of policing hospitals' charges, hospitals would have been less likely to submit padded charges. According to the plaintiffs, aggregate charge data then would have reflected a pattern of lower charges overall, and when the time came for HHS to project future outlier payments based on past aggregate charge data, HHS would have predicted a lower total of outlier payments at any given fixed loss threshold. Thus, the plaintiffs assert, HHS would have set lower fixed loss thresholds, and the plaintiffs would have received greater outlier payments.

The plaintiffs' claims based on this theory fail the second requirement of standing, which demands that the plaintiffs show that the injury they complain of is "fairly traceable to the challenged action of the defendant." To the extent that the plaintiffs claim they received lower payments because of the submission of inflated charges by other hospitals, or because of regulatory flaws that supposedly encouraged such inflated charges, the plaintiffs cannot satisfy this traceability requirement, because their grievance is based on the independent actions of these other hospitals, not actions by HHS. HHS never directed hospitals to inflate their charges; indeed, the plaintiffs acknowledge that HHS views false inflation of charges as a violation of law. See First Am. Compl. ¶¶ 15, 165 (referring to legal action taken against overcharging hospitals).

The Supreme Court and the D.C. Circuit have repeatedly held that plaintiffs cannot challenge government action based on how it supposedly creates incentives that influence or fail to influence allegedly harmful behavior by third parties. In <u>Simon v. Eastern Kentucky Welfare Rights Organization</u>, 426 U.S. 26 (1976), for example, indigent plaintiffs sought to challenge a ruling by the Internal Revenue Service (IRS) that permitted hospitals to qualify for favorable tax treatment as "charitable" corporations even if they denied nonemergency care to indigent patients. <u>See id.</u> at 28–32. The plaintiffs claimed that the IRS ruling "'encourag[ed]' the hospitals to deny services" to such patients. <u>Id.</u> at 33. The Supreme Court held that the plaintiffs lacked standing, explaining that "the 'case or controversy' limitation of Art. III . . . requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." <u>Id.</u> at 41–42. The Court accepted that the challenged policy "encourage[d] a hospital to provide fewer services to indigents than it might have under the previous policy," <u>id.</u> at 42 n.23, but it nevertheless denied standing because it was "purely speculative" whether any actual decision by a hospital to deny care to indigents could be traced to such "encouragement" rather than to independent decisions by the hospitals. <u>Id.</u> at 42–43.

Similarly, in <u>Allen v. Wright</u>, 468 U.S. 737 (1984), the Court held that parents of public school students lacked standing to sue the IRS based on alleged weaknesses in the way the IRS enforced its policy of denying tax-exempt status to racially discriminatory private schools. The Court found that the plaintiffs clearly alleged sufficient injury in the form of "their children's diminished ability to receive an education in a racially integrated school." <u>Id.</u> at 756. But the Court found that there was no clear link between the IRS's actions and the independent decisions

of racially discriminatory private schools; it was wholly speculative to assume that the extension of tax exemptions actually influenced individual schools' policies. See id. at 758.

The D.C. Circuit has followed the Supreme Court's lead in rejecting attempts to challenge regulatory action based on its supposed influence on third-party action. For example, in National Wrestling Coaches Ass'n v. Department of Education, 366 F.3d 930 (D.C. Cir. 2004), plaintiffs associated with men's collegiate wrestling sought to challenge a Department of Education policy interpretation concerning Title IX of the Education Amendments of 1972, which bars discrimination based on sex in federally funded educational programs and activities. See id. at 934–36. The plaintiffs contended that the Department's policy interpretation encouraged colleges to reduce support for men's wrestling as a way to protect themselves from liability under Title IX. See id. at 935. The D.C. Circuit found that the plaintiffs lacked standing because no decision by a college to cut funding to a men's wrestling program could fairly be traced to the challenged interpretation or would necessarily change if the court set aside the challenged policy interpretation. See id. at 938–44. The court observed that other provisions of law, including Title IX itself, created similar incentives to reduce funding to men's wrestling programs, and "other reasons unrelated to the challenged legal requirements may continue to motivate schools to take such actions." Id. at 940.

Another good example is Renal Physicians Ass'n v. U.S. Department of Health and Human Services, 489 F.3d 1267 (D.C. Cir. 2007). In that case, an association representing nephrologists sought to challenge a regulation that, according to the plaintiff, encouraged hospitals to reduce the compensation paid to some nephrologists so that the hospitals could qualify for a regulatory safe-harbor provision. See id. at 1271–72. Again, the D.C. Circuit found that the plaintiff could not challenge the regulation based on how third parties supposedly

responded to the regulation. See id. at 1276–78. The court noted that the plaintiff had not shown that the safe-harbor regulation by itself had influenced any particular nephrologist's compensation, or that hospitals would have paid nephrologists more in the absence of the regulation. See id.

In this case, the plaintiffs do not allege that HHS ever required, authorized, or instructed hospitals to submit falsely padded charges. Rather, all that the plaintiffs contend is that weaknesses in HHS's regulations created incentives for hospitals to inflate their charges. But the plaintiffs cannot show that any actual submission of inflated charges by these hospitals can be fairly traced to specific defects in HHS's regulations rather than to the general regulatory structure mandated by Congress, or to the independent decisions of unscrupulous hospitals. Congress mandated that HHS implement a system in which hospitals receive payments based on their estimated costs, and estimated costs are determined based on a hospital's charges. In such a system, there will always be some incentive for unscrupulous hospitals to pad their charges to maximize their payments, no matter how carefully HHS guards against misconduct. See Medicare Program; Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1989 Rates, 53 Fed. Reg. 38,476, 38,509 (Sept. 30, 1988) (noting that "any measure of cost . . . that is based on an indicator that is within the control of the provider provides an incentive to manipulate that indicator"); cf. Nat'l Wrestling Coaches Ass'n, 366 F.3d at 940 (noting that Title IX itself arguably created incentives to reduce funding to men's athletic programs and that "nothing but speculation suggest[ed] that schools would act any differently" if not for the challenged agency action). There is no basis for assuming that particular attributes of HHS's regulations drove hospitals to submit inflated charges.

Moreover, even if HHS were clearly to blame for some identifiable portion of hospitals' improper inflation of charges, that still would not be enough for the plaintiffs to establish standing. The plaintiffs would further have to show that the precise share of the hospitals' padded charges that could be traced to HHS's missteps was large enough that it eventually had an appreciable impact on future payments made to the plaintiffs. Merely theoretical connections linking errors by HHS, incentives supposedly created by those errors, and the amounts ultimately paid to the plaintiffs are not enough to establish standing. See Nat'l Wrestling Coaches Ass'n, 366 F.3d at 944 ("Abstract theory and conjecture are not enough to support standing . . . ."); Branton v. FCC, 993 F.2d 906, 911–12 (D.C. Cir. 1993) (noting that elementary economic theory would predict that imposing sanctions on regulated parties would deter harm to the plaintiffs, but holding that the plaintiffs still lacked standing to compel the agency to impose such sanctions because the plaintiffs could not show that sanctions would have a significant effect in practice).

Indeed, given that it is impossible to determine how hospitals would have behaved under a different regulatory regime, the plaintiffs' claims also fail the third requirement of standing, which requires a plaintiff to show that its injury would likely be redressed by a favorable decision. Because there is no way of knowing what pattern of charges other hospitals would have submitted if HHS had implemented a different regulatory scheme, there is also no way the Court could fashion relief that would ensure that the plaintiffs would receive the same payments they would have received in that other scenario. See Dynalantic Corp. v. Dep't of Def., 115 F.3d 1012, 1017 (D.C. Cir. 1997) (noting that "[t]ypically, redressability and traceability overlap as two sides of a causation coin . . . .").

The fact that HHS itself decided in 2003 to revise its regulations in hopes of reducing the impact of fraud does not alter the standing analysis. The requirement of standing is rooted in the

constitutional separation of powers and the need to prevent courts from wielding legislative power. See Wright, 468 U.S. at 750; Defenders of Wildlife, 504 U.S. at 559–60 (1992). Congress—or an administrative agency exercising authority delegated by Congress—is not bound by the Article III "case or controversy" limitation and has more freedom than a federal court to take action based on legislative judgments such as predictions about how regulated parties will respond to changes in a regulatory scheme.

Accordingly, the plaintiffs lack standing to assert any claims that attempt to trace the level of the plaintiffs' outlier payments back to incentives supposedly created by HHS's regulatory scheme.

## II. The Plaintiffs' Complaint Fails to State a Claim.

### A. Standards for Consideration of a Motion to Dismiss.

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (footnote omitted) (citations omitted); see also Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) ("[T]he court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations."). The rules of pleading require factual allegations "plausibly suggesting," and "not merely consistent with," the elements of a valid claim for relief. Bell Atl. Corp., 550 U.S. at 557. In evaluating the sufficiency of the complaint, a court considers "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice."

EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007). That includes any notices issued by HHS in the Federal Register. 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . .").

> **B.**     **The Plaintiffs' Mandamus Claim Is Not Cognizable.**

The defendant explained in Section I.B above that the plaintiffs cannot invoke this Court's jurisdiction under the Mandamus and Venue Act, 28 U.S.C. § 1361, because they have no right, let alone a clear right, to payments from the Health Care Fraud and Abuse Control Account. Thus, this claim should be dismissed.

> **C.**     **The Plaintiffs Can Only Seek Judicial Review to Correct Specific Deficiencies in their Payments; the Plaintiffs Cannot Seek Wholesale Invalidation of HHS's Regulatory Program Based on the Program's Supposed Failure to Meet Abstract Goals.**

In addition to challenging specific aspects of HHS's procedures for calculating the plaintiffs' outlier payments for the fiscal years at issue, the plaintiffs' complaint also seeks to challenge HHS's approach to outlier payments as a whole. The plaintiffs ask the Court to hold that HHS's entire regulatory program was invalid for the fiscal years at issue because HHS failed to meet what the plaintiffs suggest are the goals of the outlier payment provisions. This type of challenge is impermissible, because the applicable statutory provision authorizing judicial review only permits challenges to specific final decisions of the Secretary and does not permit a blunderbuss attack on an entire program based on its supposed failure to achieve abstract goals.

The plaintiffs in this case are seeking judicial review under 42 U.S.C. § 1395oo(f)(1), which authorizes a Medicare provider to seek judicial review of "any action of the fiscal intermediary" that determines the amounts of the provider's payments for Medicare services. Id. § 1395oo(a), (f)(1); see also Abington Crest Nursing & Rehab Ctr. v. Sebelius, 575 F.3d 717, 718

(D.C. Cir. 2009) (explaining that a "fiscal intermediary" is "a private insurance company that processes reimbursements to providers while acting as an agent of the Secretary of the Department of Health and Human Services (HHS)"). In an action for judicial review under § 1395oo(f)(1), as in other actions seeking judicial review of administrative action, the district court "'sits as an appellate tribunal.'" Cnty of Los Angeles v. Shalala, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (quoting PPG Indus., Inc. v. United States, 52 F.3d 363, 365 (D.C. Cir. 1995)). This means that the court's only function is to review the agency's actions for legal error; the court may not attempt to supervise the agency's regulatory activities. See id. at 1011–12 (holding that the district court erred in retaining jurisdiction to devise a specific remedy for the agency to follow).

Thus, in an action under § 1395oo(f)(1), a provider can only challenge specific legal errors in the determination of its payments. A broader challenge questioning whether HHS's regulatory program as a whole succeeded in meeting broad statutory objectives would exceed the limited scope of § 1395oo(f)(1) review. Indeed, in cases dealing with judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, the Supreme Court and the D.C. Circuit have held that review of an agency's compliance with broad statutory objectives would amount to impermissible judicial supervision of agency affairs. For example, in Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004), the Supreme Court wrote:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

Id. at 66–67; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 898–99 (1990) (holding that the defendant was entitled to summary judgment in an APA action that sought to challenge an

entire program rather than targeting an "identifiable action or event"); Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt., 460 F.3d 13, 21 (D.C. Cir. 2006) ("'The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives . . . is not contemplated by the APA.'" (quoting S. Utah Wilderness Alliance, 542 U.S. at 67)); Found. on Econ. Trends v. Lyng, 943 F.2d 79, 86 (D.C. Cir. 1991) (holding that the plaintiff could not "seek wholesale improvement of [a] program by court decree" (alteration in original) and could only attack the specific aspects of the program that were actually connected with its injury).

The plaintiffs in this case argue that the Court should sweep away nine years of outlier payments, the entire body of regulations and regulatory actions underlying those payments, and what the plaintiffs call the "Secretary's pattern of enforcement" of the regulations, First Am. Compl. at 56, all based on HHS's supposed failure to achieve numerous broad objectives: The plaintiffs complain that HHS failed to provide some hospitals with adequate "financial protection," see, e.g., First Am. Compl. ¶¶ 2–3, 5, 16, 51, 82, 121, 127, 175–176;[7] failed to ensure that the plaintiffs received what they would consider an appropriate share of all outlier payments made, see, e.g., First Am. Compl. ¶¶ 3–5, 114, 121–122, 167, 170, 190, and failed to adequately deter or prevent waste and abuse, see, e.g., First Am. Compl. ¶¶ 3–6, 8–11, 13–14, 16–18, 48–51, 53–55, 63–124, 128, 149–150, 161. Thus, rather than challenging a specific error in an identifiable agency action, the plaintiffs are bringing a generalized challenge on largely

---

[7] The plaintiffs not only argue that Congress generally intended to provide hospitals with "financial protection" but also argue that the statute specifically requires HHS to provide payments that cover the "marginal cost of care." See, e.g., First Am. Compl. ¶¶ 2–3, 175–176. As the defendant explains in greater detail in Section II.E.2 below, this aspect of the plaintiffs' argument relies on a misleading selective quotation of the statutory language. See infra pp. 40–41.

abstract grounds. This type of "broad programmatic attack," <u>S. Utah Wilderness Alliance</u>, 542

U.S. at 64, exceeds the limited scope of review permitted under § 1395oo(f)(1).[8]

   In addition, what the plaintiffs contend are objectives "mandated" by the statute are

nothing of the kind. The statute does not guarantee that any individual hospital will receive any

particular measure of "financial protection," nor does it command HHS to distribute outlier

payments in a way that will ensure that deserving hospitals all receive a slice of the pie. In

<u>County of Los Angeles v. Shalala</u>, 192 F.3d 1005 (D.C. Cir. 1999), the D.C. Circuit explained

that outlier payments are intended to operate only as a safety valve to stem extremely high losses

by hospitals in isolated cases, not as an "entitlement program" that would guarantee hospitals

any particular level of compensation or any particular share of all outlier payments made. <u>Cnty.

of Los Angeles</u>, 192 F.3d at 1017–18. Congress designed the system so that it forces hospitals to

---

   [8] In addition to general concerns about what the plaintiffs suggest are the goals of the
outlier payment system, the plaintiffs also invoke 42 U.S.C. § 1395x(v)(1)(A), which provides
that determinations about what are considered "reasonable costs" for Medicare services must
take account of "both direct and indirect costs" so that "the necessary costs of efficiently
delivering covered services to individuals covered by [Medicare] will not be borne by
individuals not so covered," <u>id.</u> See First Am. Compl. ¶ 176. This provision is not applicable in
this case, because it applies only to payment systems in which payments are based on hospitals'
reasonable costs, and not to the Prospective Payment System, in which payments are based on
prospectively determined rates and a payment may be either more or less than a hospital's costs
in any particular case. <u>See</u> <u>Abington Crest Nursing & Rehab. Ctr. v. Sebelius</u>, 575 F.3d 717, 720–
21 (D.C. Cir. 2009) (holding that HHS reasonably interpreted § 1395x(v)(1)(A) as applying
"only to reimbursement systems based on reasonable costs" and "not to reimbursements based
. . . on fee schedules"); <u>supra</u> p. 4 (describing the Medicare Prospective Payment System).
Moreover, even when it is applicable, § 1395x(v)(1)(A) does not create a universal requirement
that hospitals participating in Medicare must always receive full compensation for the costs they
incur in treating Medicare patients. <u>See</u> <u>Nat'l Med. Enters., Inc. v. Shalala</u>, 43 F.3d 691, 696
(D.C. Cir. 1995) ("[T]he mere fact that [costs] for Medicare patients could be borne by non-
Medicare patients in particular circumstances is not a sufficient basis upon which to find the
Secretary's methodology unreasonable . . . ."). In any event, even if § 1395x(v)(1)(A) could be
considered relevant in some fashion, the more specific provisions of 42 U.S.C.
§ 1395ww(d)(5)(A) would take precedence over this general provision in the context of outlier
payments.

absorb all losses below the cutoff point set by HHS. See supra pp. 5–7. The system as Congress designed it inevitably denies "financial protection" to hospitals in many cases, and its reliance on an inflexible cutoff can frequently produce results that may not seem fair: For example, a hospital could face large losses in numerous cases but still would not receive a penny in outlier payments if its losses happened to fall just below the fixed loss threshold in every individual case. Another hospital facing exactly the same amount of total losses across exactly the same number of cases might receive much more in outlier payments simply because its losses were distributed differently across the various cases.

Accordingly, the Court should dismiss all claims that purport to challenge HHS's supposed failure to meet amorphous goals rather than specific deficiencies in the calculation of the plaintiffs' payments. The Court should likewise dismiss the plaintiffs' claims to the extent that they seek wholesale invalidation of the entire outlier payment program or HHS's "pattern of enforcement" rather than specific corrections to the plaintiffs' payments.

### D.    HHS's Approach to Preventing, Detecting, and Pursuing False Inflation of Charges by Other Hospitals Is Committed to Agency Discretion by Law and Is Not Subject to Judicial Review.

The plaintiffs cannot challenge the adequacy of HHS's efforts to prevent, detect, and control false inflation of charges in outlier payments, because calibrating HHS's approach to fraud involves difficult judgments about resource allocation and regulatory priorities that are committed to agency discretion by law.

The plaintiffs are seeking judicial review under 42 U.S.C. § 1395oo(f)(1), which incorporates the standards and limitations of the Administrative Procedure Act, 5 U.S.C. §§ 701–706. See 42 U.S.C. § 1395oo(f)(1) (authorizing judicial review "pursuant to the applicable provisions under chapter 7 of title 5"). The Administrative Procedure Act does not authorize review when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

Agency action is "committed to agency discretion by law" when "no judicially manageable standards are available for judging how and when an agency should exercise its discretion," and a reviewing court consequently would have "no law to apply." Heckler v. Chaney, 470 U.S. 821, 830–31 (1985) (quoting Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971)).

The Supreme Court and the D.C. Circuit have held that agencies' decisions about whether, when, and how to pursue violations of law are committed to agency discretion since they involve sensitive judgments about resource allocation and agency priorities that courts are not well-equipped to review. In Heckler v. Chaney, for example, the Supreme Court considered a request to compel the FDA to take enforcement action to restrict use of drugs in lethal injection procedures. See id. at 823. The Court held that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion" and therefore unreviewable. Id. at 831. The Court noted that "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." Id. The Court concluded that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." Id. at 831–32; see also Ass'n of Irritated Residents v. EPA, 494 F.3d 1027, 1032 (D.C. Cir. 2007) (refusing to review the EPA's decision to enter a consent agreement with regulated parties because the decision entailed judgments "arising from considerations of resource allocation, agency priorities, and costs of alternatives").

The Supreme Court and the D.C. Circuit have invoked the Heckler principle in numerous other cases involving disputes about the proper allocation of agency resources, including disputes about how and when an agency should respond to attempts by regulated parties to manipulate or evade regulations. For example, in Tennessee Gas Pipeline Co. v. FERC, 972 F.2d 376 (D.C. Cir. 1992), the D.C. Circuit concluded that the Federal Energy Regulatory Commission had unreviewable discretion to decide to adopt a "wait-and-see approach" to a potential problem of manipulation in a regulatory scheme instead of building controls into the system to thwart manipulation. Id. at 381; see also, e.g., Lincoln v. Vigil, 508 U.S. 182, 193–94 (1993) (holding that decisions about how to allocate funds from lump-sum appropriations among eligible programs are committed to agency discretion by law based on the reasons cited in Heckler); Am. Trucking Ass'ns v. U.S. Dep't of Transp., 166 F.3d 374, 383 (D.C. Cir. 1999) (declining to compel the agency to set limits on safety inspectors' review of records because "courts are ill-positioned to scrutinize an agency's allocation of its scarce resources"). The D.C. Circuit has also reached similar conclusions in other cases without explicitly invoking the 5 U.S.C. § 701(a)(2) limitation on review. See, e.g., Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1234 (D.C. Cir. 1994) (upholding Medicare policies for reporting wage data as reasonable even though they arguably created incentives for intentional fraud); Alvin Lou Media, Inc. v. FCC, 571 F.3d 1, 12 (D.C. Cir. 2009) (finding that the FCC's chosen approach to the possibility of manipulation of broadcast license auctions was within the FCC's "broad discretion in fashioning an auction regime").

The timing and manner of HHS's efforts to prevent, detect, and control intentional fraud or manipulation by hospitals in the outlier payment scheme turns on sensitive judgments about "resource allocation, agency priorities, and costs of alternatives," Ass'n of Irritated Residents,

494 F.3d at 1032. There are no meaningful standards by which a reviewing court can judge whether HHS should have built additional fraud prevention measures into its payment scheme, should have subjected cost and charge data to additional (and more costly) auditing, or should have pursued violators more aggressively after the fact. Such judgments are committed to agency discretion by law and are not subject to judicial review under the Administrative Procedure Act. Accordingly, the Court should dismiss all of the plaintiffs' claims that rely on accusations that HHS failed to adequately prevent or control fraud in the design of the outlier payment scheme or failed to undertake additional auditing or analysis of data to detect fraud.

### E.    The Plaintiffs' Various Challenges Against the Fixed Loss Thresholds Set by HHS Fail to State a Claim for Various Reasons.

The plaintiffs lodge numerous challenges against the fixed loss thresholds determined each year by HHS for the fiscal years in dispute, but none of these challenges states a valid claim for relief, because none of them actually describes anything that could be considered a flaw in HHS's compliance with the statutory procedure for setting fixed loss thresholds.

As the defendant has explained, the fixed loss threshold is the "cutoff point" at which excess costs above the DRG prospective payment rate begin to qualify for outlier payments. If a hospital incurs costs that exceed the DRG prospective payment rate in a given case, the hospital must absorb all the excess costs up to the fixed loss threshold, but will receive an outlier payment equal to 80 percent of any amount by which the excess costs exceed the fixed loss threshold. The statute requires HHS to set the fixed loss threshold afresh each year based on forecasts HHS makes about payments that will be made in the coming year. See supra pp. 7–9.

The plaintiffs argue that HHS set fixed loss thresholds that were higher than they should have been for the fiscal years at issue, which caused the plaintiffs to receive outlier payments that were lower than they should have been. The plaintiffs present numerous alternative reasons why

they believe the fixed loss thresholds should be set aside: because HHS failed to adequately

curtail fraud by other hospitals; because changes in the fixed loss threshold from year to year did

not closely track inflation or movements in hospitals' costs; or because HHS never readjusted the

fixed loss thresholds to account for differences between its projections and actual future events.

For various reasons, none of these objections actually states a valid claim.

      1.   <u>Submission of Inflated Charges by Other Hospitals Does Not Provide a</u>
<u>Basis for Challenging the Fixed Loss Thresholds, Because HHS's Task</u>
<u>When It Sets Fixed Loss Thresholds Is Simply to Predict the Total</u>
<u>Payments that Will Be Made Given the Existing Regulatory Scheme.</u>

      The plaintiffs cannot challenge the fixed loss thresholds set by HHS based on supposed

defects in HHS's methods for calculating outlier payments based on hospital charges. Any such

challenges fail the requirement of standing and fail to state a claim for the reasons explained in

Sections I.C and II.D above. Moreover, even supposing that the Court could identify flaws in

HHS's payment policies, weaknesses in the payment scheme would not render the fixed loss

thresholds invalid. When HHS sets fixed loss thresholds, its task is simply to make a prediction

about the amounts of ordinary payments and outlier payments that will be made in the next fiscal

year given the payment scheme that will be in place during that period. The validity of HHS's

projections depends on the reasonableness of the methods it uses to make those projections, not

on the relative merits of the payment scheme itself. As long as HHS uses reasonable predictive

methods, its predictions, and the fixed loss thresholds it calculates based on those predictions,

must be upheld as reasonable.

      As explained above, HHS must set the fixed loss threshold so that the total amount of

projected outlier payments for the next year falls between 5 and 6 percent of the total amount of

projected ordinary payments based on DRG prospective payment rates for the next year. HHS

accomplishes this by taking historical data on charges actually submitted by hospitals, updating

the data to account for inflation, feeding the inflation-adjusted data into the current payment calculation mechanism, and tallying the simulated payments that result when the fixed loss threshold is set at different possible levels. See supra pp. 7–9. The idea is that the pattern of charges in a recent year provides a fair basis for predicting the pattern of charges in a future year.

The plaintiffs contend that HHS's annual payment projections for the disputed fiscal years, and the fixed loss thresholds HHS set based on those projections, were invalid because supposed defects in HHS's methods for calculating payments led other hospitals to submit falsely inflated charges. They argue that because of these supposed defects in the payment scheme, it was improper for HHS to use historical payment data to forecast the amounts of payments that would be made in the future. See First Am. Compl. ¶¶ 16, 18, 124–125, 128, 149–153, 161, 167.

The plaintiffs' arguments fail for several reasons. First, the plaintiffs' claim that HHS failed to build sufficient protection against fraud into its methods for calculating outlier payments fails the requirements of standing and fails to state a claim for the reasons the defendant explained in Sections I.C and II.D above.

Second, the task of designing a regulatory system is separate and distinct from the task of predicting the payments that will be made under an existing regulatory system. Even if it could be said that HHS should have had different outlier payment policies in place, and that those different policies would have produced a different pattern of hospital charge data, that would not mean that HHS did anything wrong when it made projections about the total outlier payments that it would make in each fiscal year under the policies that actually were in place.

Finally, while the plaintiffs generally assert that the historical data that HHS used to make its payment projections was not the "best available data," see First Am. Compl. ¶¶ 16, 149, they

do not allege that there was any other data source that was available to HHS at the time and that HHS should have known would be superior as a basis for predicting future hospital charges. The plaintiffs cannot make out a claim that HHS failed to use "the best available data" without alleging the existence of better data that HHS should have used instead. See Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) ("[T]he court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations.").

Nor can the plaintiffs make out a claim by alleging that HHS should have itself made better data available by conducting additional analysis and auditing on existing data, see First Am. Compl. ¶ 128. HHS's decisions about whether to devote resources to additional auditing and analysis efforts are committed to agency discretion by law for the reasons explained in Section II.D above. See also Milk Train, Inc. v. Veneman, 310 F.3d 747, 754 (D.C. Cir. 2002) ("An agency 'typically has wide latitude in determining the extent of data-gathering necessary to solve a problem.'" (quoting Allied Local & Reg'l Mfrs. Caucus v. U.S. EPA, 215 F.3d 61, 71 (D.C. Cir. 2000))).

When HHS sets fixed loss thresholds for the coming year, its only task is to adjust the fixed loss threshold so that projected outlier payments will add up to an amount between 5 and 6 percent of projected DRG-related payments given the payment scheme that will be in place in the coming year. Allegations about supposed flaws in the payment scheme do not provide any basis for challenging the reasonableness of HHS's payment projections. The plaintiffs assert only that HHS should have adopted different outlier payment policies; they do not assert that HHS should have or could have improved its predictive methods to more accurately forecast future

payments. Accordingly, the plaintiffs' allegations about fraud by other hospitals do not suggest that HHS acted improperly when it set the fixed loss thresholds.

   2.   The Fact that Changes in Fixed Loss Thresholds Did Not Match Inflation
        Does Not Suggest that the Fixed Loss Thresholds Were Invalid, as Fixed
        Loss Thresholds Are Set Based on a Nationwide Budget Limit and Are
        Neither Expected Nor Required to Move in Step with Hospitals' Costs.

The fact that year-to-year changes in the fixed loss threshold during the fiscal years at issue did not correspond to inflation over the same period, see First Am. Compl. ¶¶ 14, 129–148, 155–158, 161, 175–176, also does not suggest that the fixed loss thresholds were invalid. The statute instructs HHS to set new fixed loss thresholds each year based on aggregate payment projections for the Medicare Program as a whole; fixed loss thresholds are neither intended nor required to track inflation or move in step with hospitals' costs.[9]

As the defendant explained earlier, the fixed loss threshold represents the dollar amount of excess costs above the DRG prospective payment rate that a hospital is expected to bear in any single case before the case qualifies for an outlier payment. The statute instructs HHS to set the fixed loss threshold annually based on estimates it makes of projected total payments for the entire Medicare program in the next fiscal year. HHS must set the fixed loss threshold so that the projected total of all outlier payments across the Medicare program falls between 5 and 6 percent of the projected total of all payments based on DRG prospective payment rates across the Medicare Program. See supra pp. 7–9.

---

[9] At some points in their complaint, the plaintiffs contend that changes in the fixed loss threshold from year to year should have corresponded to inflation. See, e.g., First Am. Compl. ¶¶ 14, 129–148, 155–158. At other points, the plaintiffs appear to suggest that fixed loss thresholds should have represented approximately the same fraction of hospitals' costs from year to year. See, e.g., First Am. Compl. ¶¶ 175–176. "Inflation," of course, means a general rise in the dollar prices of comparable goods and services, see Black's Law Dictionary 848 (9th ed. 2009), so these are essentially just two different ways of presenting the same argument.

Thus, Congress specifically instructed HHS to set the fixed loss threshold annually based on what essentially amounts to a nationwide budget calculation. Congress did not expect or require that changes in the fixed loss threshold from year to year would match inflation, or that the fixed loss threshold would move in step with the costs faced by individual hospitals. Indeed, if Congress had wanted the fixed loss threshold to move with inflation, it would have simply required HHS to adjust the fixed loss threshold each year based on an inflation index. Other provisions of Medicare show that "Congress knows how" to impose such a requirement "when it desires to do so," Astrue v. Ratliff, 130 S. Ct. 2521, 2527 (2010). See, e.g., 42 U.S.C. § 1395ww(h)(2)(D)(i) (specifying that a hospital's full-time-equivalent resident amount is to be determined by taking the full-time-equivalent resident amount for the previous cost reporting period and updating it to account for inflation); id. § 1395f(i)(2)(B) (specifying a "cap amount" for payments for hospice care and specifying that the figure is to be updated to account for inflation). Congress established different requirements in § 1395ww(d)(5)(A)(iv) simply because it did not intend the fixed loss threshold to move with inflation. See Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Rates and Costs of Graduate Medical Education: Fiscal Year 2002 Rates; Provisions of the Balanced Budget Refinement Act of 1999; and Provisions of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000, 66 Fed. Reg. 39,827, 39,941 (Aug. 1, 2001) (noting that determining the fixed loss threshold by simply updating the previous year's threshold by an inflation factor "would not be appropriate" given the requirements spelled out in § 1395ww(d)(5)(A)(iv)).

The plaintiffs appear to suggest that fixed loss thresholds should represent a consistent fraction of hospitals' costs from year to year and should move with inflation because the statute specifies that outlier payments must "approximate the marginal cost of care." See First Am.

Compl. ¶¶ 2–3, 175–176. But the plaintiffs are selectively quoting the statutory language in a

grossly misleading way. What the statute actually says is that outlier payments must

"approximate the marginal cost of care beyond the cutoff point applicable under

[§ 1395ww(d)(5)(A)(ii)]." 42 U.S.C. § 1395ww(d)(5)(A)(iii). An outlier payment is not supposed

to reflect all of a hospital's excess costs above the DRG prospective payment rate for a given

case; rather, an outlier payment is supposed to reflect only the portion of those excess costs that

falls above the fixed loss threshold. See supra pp. 5–7 (explaining and illustrating the

significance of the fixed loss threshold). Excess costs below the "cutoff point" are not reflected

in outlier payments, and the cutoff point itself need not represent a consistent fraction of

hospitals' costs from year to year. As the D.C. Circuit noted in County of Los Angeles v. Shalala,

192 F.3d 1005 (D.C. Cir. 1999), outlier payments are only intended to relieve part of the losses

that a hospital might face when it treats an extraordinarily costly case; outlier payments are not

designed to operate as an "entitlement program" that insulates medical providers from all

possible losses or guarantees medical providers a certain level of compensation every year. Cnty.

of Los Angeles, 192 F.3d at 1017–18.

    Accordingly, the fact that changes to the fixed loss threshold from year to year did not

appear to correspond closely to measures of inflation or changes in individual hospitals' costs

would not suggest that the fixed loss thresholds were set improperly.

          3.  The Fact that Actual Payment Totals Did Not Exactly Match HHS's
              Projections Does Not Suggest that HHS's Predictive Methods Were Faulty
              and Does Not Make HHS's Fixed Loss Threshold Determinations Invalid.

    The fact that actual outlier payments in each of the fiscal years at issue did not exactly

match the projected totals that HHS had computed when it set fixed loss thresholds, see First

Am. Compl. ¶¶ 47, 159, 161, also does not provide any basis for challenging the fixed loss

thresholds. HHS is only required to make reasonable predictions based on the information

available to it at the time. It is not required to forecast the future with clairvoyant precision, and it is not required to readjust outlier payments later to account for differences between its projections and the actual payments it makes.

Differences between HHS's projections and actual future outcomes do not render HHS's projections invalid. The statute requires only that HHS make reasonable projections using reasonable methods; it does not require HHS to foretell the future with perfect clarity. "Projections of any kind . . . are necessarily speculative, inexact, and riddled with uncertainty." North Carolina v. FERC, 112 F.3d 1175, 1190 (D.C. Cir. 1997). Indeed, a court reviewing agency action must base its review on the information available to the agency at the time of the action; a court cannot set aside agency action based on its knowledge of how things turned out after the agency acted. See Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision.").

The D.C. Circuit's ruling in County of Los Angeles v. Shalala forecloses any claim that HHS must recalculate the plaintiffs' payments merely because its projected total payments for the fiscal years at issue did not match up exactly with actual total payments. In County of Los Angeles, hospitals sought to compel HHS to readjust outlier payments to make up for differences between HHS's projections of total payments and the total actual payments ultimately made. The court rejected the plaintiffs' challenge, holding that HHS had properly interpreted § 1395ww(5)(A)(iv) as "speak[ing] only to how [HHS] is to calculate outlier thresholds for the forthcoming year," and not imposing any "obligation to ensure that actual outlier payments for the year total five percent of projected DRG-related payments." Cnty. of Los Angeles, 192 F.3d at 1013; see id. at 1020 (upholding HHS's interpretation). The D.C. Circuit found that requiring

42

HHS to readjust outlier payments as the plaintiffs requested would inappropriately "transform the character of the outlier-payment regime from a system intended to insulate hospitals from aberrational and extraordinary costs into nothing more than an entitlement program for Medicare providers." Id. at 1017–18.

Thus, HHS has no obligation to adjust the plaintiffs' outlier payments merely because its projected total payments did not match up exactly with actual total payments. Similarly, HHS has no obligation to recalculate the fixed loss thresholds for the disputed fiscal years simply because it has recovered some funds previously paid to hospitals based on improper claims, see First Am. Compl. ¶¶ 162–174. Again, County of Los Angeles established that the statute does not require HHS to adjust actual outlier payments so that they add up to any specific sum.[10]

_____

[10] The plaintiffs also argue that HHS was required to set the fixed loss threshold between $22,000 and $23,000 for fiscal years 2004 to 2006 based on remarks by Thomas A. Scully, a former Administrator of the Centers for Medicare and Medicaid Services, at a Senate subcommittee hearing in 2003. The plaintiffs argue that Scully's remarks suggested that $22,000 to $23,000 was the only "appropriate" level for the fixed loss threshold. See First Am. Compl. ¶¶ 154, 160–161.

The plaintiffs are quoting Scully's remarks out of context and misreading them. Reading the remarks in context makes clear that Scully was simply describing an initial guess about where the fixed loss threshold should be set for fiscal year 2003, and was not suggesting that the final fixed loss threshold determined by HHS for fiscal year 2003 or any other fiscal year was incorrect or improper in any way. See Medicare Outlier Payments to Hospitals: Hearing Before a Subcomm. of the S. Comm. on Appropriations, 108th Cong. 12–13 (2003), available at http://origin.www.gpo.gov/fdsys/pkg/CHRG-108shrg85832/pdf/CHRG-108shrg85832.pdf. The Court can consider Scully's testimony in its entirety without converting this motion to a motion for summary judgment, because the Scully testimony is referred to in the complaint and is integral to the plaintiffs' claims to the extent that they rely on Scully's remarks, and also because the record of the Senate subcommittee hearing is a matter of public record subject to judicial notice. See Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

In any event, whatever Scully meant by his remarks, HHS was not required to adopt Scully's opinions about the fixed loss thresholds as its final policy. See Wisconsin v. City of New York, 517 U.S. 1, 23 (1996) ("[T]he mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision."); St. (continued . . .)

## <u>CONCLUSION</u>

Because the plaintiffs have no clear right to be paid funds from the Health Care Fraud and Abuse Control Account, the plaintiffs' claims for mandamus relief should be dismissed for lack of subject matter jurisdiction and for failure to state a claim. Furthermore, because the Court cannot grant relief against HHS based on fraud committed by other hospitals or any supposed failure to prevent fraud, and because the allegations of the plaintiffs' complaint do not otherwise suggest that HHS's procedures were defective in any way, the plaintiffs' claims seeking judicial review under the Medicare Act should also be dismissed for lack of subject matter jurisdiction and for failure to state a claim.

Date: January 28, 2010                    Respectfully submitted,

                                          TONY WEST
                                          Assistant Attorney General

                                          RONALD C. MACHEN JR.
                                          United States Attorney

                                          SHEILA M. LIEBER
                                          Deputy Director

                                          /s/ JAMES C. LUH
                                          JAMES C. LUH
                                          Trial Attorney
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          20 Massachusetts Ave NW
                                          Washington DC 20530
                                          Tel: (202) 514-4938
                                          Fax: (202) 616-8460
                                          E-mail: James.Luh@usdoj.gov
                                          Attorneys for Defendant

---

Marks Place Hous. Co. v. U.S. Dep't of Hous. & Urban Dev., 610 F.3d 75, 83 (D.C. Cir. 2010) (holding that the different views of a subordinate agency official were immaterial to review of the agency's final decision). Rather, HHS was required to set the fixed loss threshold according to the statutory procedure set forth in 42 U.S.C. § 1395ww(d)(5)(A)(iv). Scully's remarks provide no basis for challenging the fixed loss thresholds determined by HHS.