**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**BANNER HEALTH** f/b/o **BANNER GOOD SAMARITAN MEDICAL CENTER**, *et al.*,

*Plaintiffs*,

v.

**KATHLEEN SEBELIUS**, Secretary of the U.S. Department of Health and Human Services,

*Defendant*.

Civil Action No. 10-01638 (CKK)

**MEMORANDUM OPINION**
(July 15, 2011)

Plaintiffs are twenty-nine organizations that own or operate hospitals participating in the Medicare program. They have sued the Secretary of the Department of Health and Human Services (the "Secretary"), challenging an array of actions taken by the Secretary in the course of administering Medicare's "outlier" payment system. The Secretary has filed a [17] Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim ("Motion to Dismiss"), seeking the dismissal of this action in its entirety. Upon a searching review of the parties' submissions, the relevant authorities, and the record as a whole, the motion will be granted in part and denied in part.

## I. STATUTORY AND REGULATORY FRAMEWORK

Medicare "provides federally funded health insurance for the elderly and disabled," *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1226-27 (D.C. Cir. 1994), through a "complex statutory and regulatory regime," *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402

(1993). The program is administered by the Secretary through the Centers for Medicare and Medicaid Services. *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011).

From its inception in 1965 until 1983, Medicare reimbursed hospitals based on "the 'reasonable costs' of the inpatient services that they furnished." *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1008 (D.C. Cir. 1999) (quoting 42 U.S.C. § 1395f(b)), *cert. denied*, 530 U.S. 1204 (2000). However, "[e]xperience proved . . . that this system bred 'little incentive for hospitals to keep costs down' because '[t]he more they spent, the more they were reimbursed.'" *Id.* (quoting *Tucson Med. Ctr. v. Sullivan*, 947 F.2d 971, 974 (D.C. Cir. 1991)).

In 1983, with the aim of "stem[ming] the program's escalating costs and perceived inefficiency, Congress fundamentally overhauled the Medicare reimbursement methodology." *Cnty. of Los Angeles*, 192 F.3d at 1008 (citing Social Security Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 149). Since then, the Prospective Payment System, as the overhauled regime is known, has reimbursed qualifying hospitals at prospectively fixed rates. *Id.*
By enacting this overhaul, Congress sought to "reform the financial incentives hospitals face, promoting efficiency in the provision of services by rewarding cost[-]effective hospital practices." H.R. Rep. No. 98-25, at 132 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 351.

***A. Calculating Prospective Payment Rates***

In calculating prospective payment rates, the Secretary begins with the "standardized amount," a figure that approximates the average cost incurred by hospitals nationwide for each treated patient. *See* 42 U.S.C. § 1395ww(d)(2). Following Congress's directive, the Secretary "does not calculate the standardized amount from scratch each year," but "[i]nstead . . . calculated the standardized amount for a base year and . . . carrie[s] that figure forward, updating

it annually for inflation." *Cape Cod*, 630 F.3d at 205 (citing, *inter alia*, 42 U.S.C. § 1395ww(b)(3)(B)(I), (d)(2), (d)(3)(A)(iv)(II); 42 C.F.R. § 412.64(c)-(d)).

To account for regional variations in labor costs, the Secretary then "determines the proportion of the standardized amount attributable to wages and wage-related costs and then multiples that labor-related proportion by a wage index that reflects the relation between the local average of hospital wages and the national average of hospital wages." *Cape Cod*, 630 F.3d at 205 (internal quotation marks omitted; citing, *inter alia*, 42 U.S.C. § 1395ww(d)(2)(H), (d)(3)(E)). "Unlike the standardized amount, wage indexes are calculated anew each year." *Id.*

Finally, the standardized amount is weighted to "reflect[] the disparate hospital resources required to treat major and minor illnesses." *Cnty. of Los Angeles*, 192 F.3d at 1008 (citing 42 U.S.C. § 1395ww(d)(4)). Specifically, "Medicare patients are classified into different groups based on their diagnoses, and each of these 'diagnosis-related groups'[1] is assigned a particular 'weight' representing the relationship between the cost of treating patients within that group and the average cost of treating all Medicare patients." *Cape Cod*, 630 F.3d at 205-06 (citing 42 U.S.C. § 1395ww(d)(4)).

Therefore, to calculate how much a hospital should be paid for treating a particular case, the Secretary "takes the [standardized amount], adjusts it according to the wage index, and then multiplies it by the weight assigned to the patient's [diagnosis-related group]." *Cnty. of Los Angeles*, 192 F.3d at 1009.[2] The result is commonly referred to as the "DRG prospective

[1] There are several hundred recognized diagnosis-related groups ("DRGs").

[2] Formulaically:

$$[SA \cdot (\text{non-labor\%}) + (SA \cdot (\text{labor\%}) \cdot WI)] \cdot (\text{DRG Weight}) = \text{Payment}$$

payment rate." *Id.*

### *B. Outlier Payments and the Fixed Loss Threshold*

By design, the Prospective Payment System does not reimburse hospitals for the actual costs of the care that they provide to individual Medicare patients. Depending on how the costs incurred by a hospital in a particular case align with the DRG prospective payment rate, the hospital "may be over- or under-compensated for any given procedure." *Dist. Hosp. Partners, L.P. v. Sebelius*, __ F. Supp. 2d __, No. 11 Civ. 116 (ESH), 2011 WL 2621000, at *1 (D.D.C. July 5, 2011). However, "[d]espite the anticipated virtues of [the Prospective Payment System], Congress recognized that health-care providers would inevitably care for some patients whose hospitalization would be extraordinarily costly or lengthy" and devised a means to "insulate hospitals from bearing a disproportionate share of these atypical costs." *Cnty. of Los Angeles*, 192 F.3d at 1009. Specifically, Congress authorized the Secretary to make supplemental "outlier" payments to eligible providers. *Id.*

Outlier payments are governed by 42 U.S.C. § 1395ww(d)(5)(A), which provides, in relevant part, as follows:

> (ii) . . . [A] hospital [paid under the Prospective Payment System] may request additional payments in any case where charges, adjusted to cost, . . . exceed the sum of the applicable DRG prospective payment rate plus any amounts payable under subparagraphs (B) and (F)[3] plus a fixed dollar amount

---

Where SA = standardized amount; labor% = the proportion of the standardized amount attributable to wages and wage-related costs; non-labor% = the proportion of the standardized amount not attributable to labor-related costs; WI = wage index; and DRG Weight = the weight assigned to a particular diagnosis-related group. *See Cape Cod*, 630 F.3d at 206.

[3] The referenced subparagraphs contemplate certain add-on payments to offset the costs of graduate medical education and care of low-income patients. *See* 42 U.S.C. §

> determined by the Secretary.
>
> (iii) The amount of such additional payment . . . shall be determined by the Secretary and shall . . . approximate the marginal cost of care beyond the cutoff point applicable under clause . . . (ii).

42 U.S.C. § 1395ww(d)(5)(A); *see also* 42 C.F.R. §§ 412.80-412.86 (implementing regulations).

Each fiscal year, the Secretary determines a fixed dollar amount that, when added to the DRG prospective payment, serves as the cutoff point triggering eligibility for outlier payments. *See* 42 U.S.C. § 1395ww(d)(5)(A)(ii), (iv); 42 C.F.R. § 412.80(a)(2)-(3). This fixed dollar amount is known as the "fixed loss threshold." If a hospital's approximate costs actually incurred in treating a patient exceed the sum of the DRG prospective payment rate and the fixed loss threshold, then the hospital is eligible for an outlier payment in that case. *See* 42 U.S.C. § 1395ww(d)(5)(A)(ii)-(iii); 42 C.F.R. § 412.80(a)(2)-(3). In this way, the fixed loss threshold represents the dollar amount of loss that a hospital must absorb in any case in which the hospital incurs estimated actual costs in treating a patient above and beyond the DRG prospective payment rate. An increase in the fixed loss threshold reduces the number of cases that will qualify for outlier payments as well as the amount of payments for qualifying cases.

In designing the Prospective Payment System, Congress provided that "[t]he total amount of the additional [outlier] payments . . . for discharges in a fiscal year may not be less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year." 42 U.S.C. § 1395ww(d)(5)(iv). Under the Secretary's interpretation of the statute, which has been upheld by the United States

---

1395ww(d)(5)(B), (F). These and other intricacies of the outlier payment system are not at issue in this action, and are not addressed in this opinion.

Court of Appeals for the District of Columbia Circuit, "she must establish the fixed [loss] thresholds beyond which hospitals will qualify for outlier payments" at the start of each fiscal year. *Cnty. of Los Angeles*, 192 F.3d at 1009. To do so, the Secretary first makes a predictive judgment about the total amount of payments that can be expected to be paid based on DRG prospective payment rates. *Cnty. of Los Angeles*, 192 F.3d at 1009. She then examines historical data to determine the threshold that "would probably yield total outlier payments falling within the five-to-six-percent range." *Id.* For obvious reasons, "[w]hether the Secretary's projections prove to be correct will depend, in large part, on the predictive value of the historical data on which she bases her calculations." *Id.* In each of the fiscal years at issue in this action, the Secretary set fixed loss thresholds at a level so that the anticipated total of outlier payments would equal 5.1% of the anticipated total of payments based on DRG prospective payment rates.

As aforementioned, if a hospital's approximate costs actually incurred in treating a patient exceed the sum of the DRG prospective payment rate and the fixed loss threshold, then the hospital is eligible for an outlier payment in that case. *See* 42 U.S.C. § 1395ww(d)(5)(A)(ii)-(iii); 42 C.F.R. § 412.80(a)(2)-(3). The amount of the outlier payment is "determined by the Secretary" and must "approximate the marginal cost of care" beyond the fixed loss threshold. 42 U.S.C. § 1395ww(d)(5)(A)(iii). During the time period relevant to this action, the implementing regulations generally provided for outlier payments equal to eighty percent of the difference between the hospital's estimated operating and capital costs and the fixed loss threshold. *See* 42 C.F.R. § 412.84(k). In this way, "[t]he amount of the outlier payment is proportional to the amount by which the hospital's loss exceeds the [fixed loss] threshold." *Dist. Hosp. Partners*, 2011 WL 2621000, at *2 (citing 42 C.F.R. § 412.84(k)).

An example may be helpful. Imagine that it is fiscal year 1998 and a hospital has incurred an estimated $72,000 in actual costs in providing a patient covered by Medicare with a pituitary procedure.[4] In fiscal year 1998, the DRG prospective payment for pituitary procedures was $8,002.49 and the established fixed loss threshold was $11,050. Because the hospital's estimated actual costs ($72,000) exceed the sum of those two figures ($19,052.49), the case would be eligible for an outlier payment. To determine the amount of the outlier payment, the difference between the hospital's estimated actual costs ($72,000) and the sum of the DRG prospective payment and the fixed loss threshold ($19,052.49) is considered, which results in an amount of $52,947.51. That figure, in turn, is multiplied by the percentage established by regulation intended to approximate the hospital's marginal cost of care beyond the fixed loss threshold (80%), resulting in an outlier payment in the amount of $42,358.01.

What does this mean from the hospital's perspective? The hospital is paid the DRG prospective payment of $8.002.49 and the outlier payment specific to the patient's case in the amount of $42,358.01, a total of $50,360.50. Meanwhile, the hospital must cover the fixed loss threshold of $11,050 and the unreimbursed twenty percent of the hospital's cost of care beyond the fixed loss threshold of $10,589.50, a total of $21,639.50.

In the absence of the outlier payment system, the hospital would have $63,997.51 in unreimbursed estimated costs—far more than the $21,639.50 contemplated by this hypothetical. Which is just to say that outlier payments play an important role in the way healthcare providers are compensated, and explains why they are so often the subject of litigation.

---

[4] The example is drawn from a notice published in the Federal Register. *See* MEDICARE PROGRAM; CHANGES TO THE HOSPITAL INPATIENT PROSPECTIVE PAYMENT SYSTEMS AND FISCAL YEAR 1998 RATES, 62 Fed. Reg. 45,966, 45,997 (Aug. 29, 1997).

## II. PROCEDURAL BACKGROUND

Plaintiffs are twenty-nine organizations that own or operate hospitals participating in the Medicare program. Am. Compl., ECF No. [16], ¶ 22. Plaintiffs contend that during fiscal years 1998 through 2006, they were deprived of more than $350 million in outlier payments. *Id.* ¶ 17. Plaintiffs filed appeals with the Provider Reimbursement Review Board ("PRRB"), each challenging the Secretary's final outlier payment determinations for the fiscal years in question. *Id.* ¶¶ 191-92. Because Plaintiffs' administrative appeals called into question the underlying validity of regulations promulgated by the Secretary, the PRRB determined that it was without authority to resolve the matters raised and, upon Plaintiffs' petition, authorized expedited judicial review pursuant to 42 U.S.C. § 1395oo(f)(1). *Id.* ¶¶ 193-95 & Exs. A-B.

Plaintiffs commenced this action on September 27, 2010, claiming that this Court has jurisdiction under the Medicare Act, 42 U.S.C. § 1395oo(f)(1), and the Mandamus Act, 28 U.S.C. § 1361. *See* Compl., ECF No. [1]. On December 23, 2010, they filed an Amended Complaint as a matter of right, which remains the operative iteration of the Complaint in this action. *See* Am. Compl., ECF No. [16]. On January 28, 2011, the Secretary filed the pending Motion to Dismiss. *See* Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim ("Def.'s Mem."), ECF No. [17-1]. On March 16, 2011, Plaintiffs filed their opposition. *See* Pls.' Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss ("Pls.' Opp'n"), ECF No. [19]. On April 4, 2011, the Secretary filed a reply. *See* Def.'s Reply Mem. in Supp. of Mot. to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim ("Def.'s Reply"), ECF No. [21]. The motion is therefore fully briefed and ripe for adjudication.

## III. THE AMENDED COMPLAINT

By any reasonable measure, the Amended Complaint is sprawling; it consists of over two hundred paragraphs (several with discrete sub-parts), spans fifty-nine pages, and is accompanied by two lengthy exhibits. In the opening paragraph, Plaintiffs claim to seek "judicial review of the final administrative decisions of the Secretary . . . as to the amount of Medicare 'outlier' payments due Plaintiffs for services provided under the Medicare program for fiscal years 1998 - 2006," Am. Compl. ¶ 1, but this rather discrete description is misleading, as the allegations in the Amended Complaint sweep much more broadly. Indeed, as described by Plaintiffs themselves, at the "heart" of their case is a wide-ranging challenge to the way the Secretary "implemented" the outlier payment system. Pls.' Opp'n at 6 (citing Am. Compl. ¶¶ 3-5, 17).[5] In this regard, Plaintiffs' challenges fall into five basic categories, the first four arising under the Medicare Act and the fifth arising under the Mandamus Act.

### *A. Challenges to the Secretary's Outlier Payment Regulations*

First, Plaintiffs contend that the Secretary's regulations establishing the methodology for calculating outlier payments (the "Outlier Payment Regulations"), 42 C.F.R. §§ 412.80-412.86, contained "vulnerabilities" that made them "uniquely susceptible to manipulation" by unscrupulous hospitals. Pls.' Opp'n at 6 (citing Am. Compl. ¶¶ 52-98, 138). The Outlier Payment Regulations were first enacted in 1985 and have been revisited periodically over the years, most notably in 1988 and 2003. *See* MEDICARE PROGRAM; CHANGES TO IMPLEMENT THE INPATIENT HOSPITAL PROSPECTIVE PAYMENT SYSTEM AND FISCAL YEAR 1989 RATES, 53 Fed.

---

[5] Given the sheer breadth of Plaintiffs' allegations, and the wide range of discrete administrative actions covered, Plaintiffs' passing suggestion in a footnote that they are pursuing a single, indivisible claim is untenable. *See* Pls.' Opp'n at 39 n.20.

Reg. 38,476 (Sept. 30, 1988); MEDICARE PROGRAM; CHANGE IN METHODOLOGY FOR DETERMINING PAYMENT FOR EXTRAORDINARILY HIGH-COST CASES (COST OUTLIERS), 68 Fed. Reg. 34,494 (June 9, 2003).

Plaintiffs claim that there were three key "vulnerabilities" in the Outlier Payment Regulations in the form that they existed in the fifteen year period extending from 1988 to 2003:[6]

(1) They required calculation of a hospital's estimated costs based upon "inherently inaccurate and unaudited data," including uninterrogated data gleaned from non-concurrent cost reports, Am. Compl. ¶¶ 56-84;

(2) They contemplated that a hospital's cost-to-charge ratio would default to a statewide average whenever that ratio fell more than three standard deviations above or below the nationwide mean, Am. Compl. ¶¶ 85-92; and

(3) They failed to provide a mechanism that would allow for outlier payments to be audited and adjusted by fiscal intermediaries as a check against aggressive charge inflation, Am. Compl. ¶¶ 93-98.

According to Plaintiffs, the confluence of these three "vulnerabilities" in the Outlier Payment Regulations (a) allowed unscrupulous hospitals to submit excessive reimbursement claims, (b) "led to massive overpayments" to the wrong hospitals, (c) prompted the Secretary to raise the fixed loss threshold at the beginning of each fiscal year as a misguided countermeasure, and (d) ended with Plaintiffs being denied the outlier payments "to which they were entitled." Am. Compl. ¶ 55.

***B. Challenges to the Secretary's Fixed Loss Threshold Regulations***

Second, Plaintiffs challenge the Secretary's annual promulgation of the regulations through which she sets the fixed loss threshold for the upcoming fiscal year (the "Fixed Loss

[6] Plaintiffs' allegations are directed principally towards the regulations in the form in which they were enacted in 1988. *See, e.g.*, Am. Compl. ¶¶ 75-85, 98, 107-10.

Threshold Regulations"), for fiscal years 1998 through 2006.[7] *See* Am. Compl. ¶¶ 123-61. In particular, Plaintiffs contend that the Secretary, faced with an "aberrantly high" level of projected outlier payments caused by a flood of excessive reimbursement claims, made no attempt to diagnose the actual source of the problem but instead, as a misguided countermeasure, made "enormous, unprecedented and irrational increases" in the fixed loss threshold for the fiscal years at issue in this action, and did so without providing an adequate, reasoned explanation for the increases. Pls.' Opp'n at 7 (citing Am. Compl. ¶¶ 14, 69, 112, 114, 119, 121, 125-26, 129-38, 147-48, 155-61). To illustrate this point, Plaintiffs allege that the fixed loss threshold increased by 246% from fiscal year 1997 to fiscal year 2003, even though there was only a modest level of cost inflation during the same period. *See id.* (citing Am. Compl. ¶¶ 14, 121, 137, 147).

Plaintiffs attribute the "irrational" increase in fixed loss thresholds to three alleged flaws in the Secretary's Fixed Loss Threshold Regulations:

(1) They lacked a means for accurately distinguishing between inflation in legitimate reimbursement claims from inflation in illegitimate reimbursement claims;

---

[7] *See* MEDICARE PROGRAM; CHANGES TO THE HOSPITAL INPATIENT PROSPECTIVE PAYMENT SYSTEMS AND FISCAL YEAR 1998 RATES, 62 Fed. Reg. 45,966 (Aug. 29, 1997); MEDICARE PROGRAM; CHANGES TO THE HOSPITAL INPATIENT PROSPECTIVE PAYMENT SYSTEMS AND FISCAL YEAR 1999 RATES, 63 Fed. Reg. 40,954 (July 31, 1998); CHANGES TO THE HOSPITAL INPATIENT PROSPECTIVE PAYMENT SYSTEMS AND FISCAL YEAR 2000 RATES, 64 Fed. Reg. 41,490 (July 30, 1999); CHANGES TO THE HOSPITAL INPATIENT PROSPECTIVE PAYMENT SYSTEMS AND FISCAL YEAR 2001 RATES, 65 Fed. Reg. 47,054 (Aug. 1, 2000); CHANGES TO THE HOSPITAL INPATIENT PROSPECTIVE PAYMENT SYSTEMS AND RATES AND COSTS OF GRADUATE MEDICAL EDUCATION: FISCAL YEAR 2002 RATES, 66 Fed. Reg. 39,828 (Aug. 1, 2001); CHANGES TO THE HOSPITAL INPATIENT PROSPECTIVE PAYMENT SYSTEMS AND FISCAL YEAR 2003 RATES, 67 Fed. Reg. 49,982 (Aug. 1, 2002); CHANGES TO THE HOSPITAL INPATIENT PROSPECTIVE PAYMENT SYSTEMS AND FISCAL YEAR 2004 RATES, 68 Fed. Reg. 45,346 (Aug. 1, 2003); CHANGES TO THE HOSPITAL INPATIENT PROSPECTIVE PAYMENT SYSTEMS AND FISCAL YEAR 2005 RATES, 69 Fed. Reg. 48,916 (Aug. 11, 2004); CHANGES TO THE HOSPITAL INPATIENT PROSPECTIVE PAYMENT SYSTEMS AND FISCAL YEAR 2006 RATES, 70 Fed. Reg. 47,278 (Aug. 12, 2005).

(2) They made no meaningful attempt to correlate the increase in the fixed loss threshold with the rate of cost inflation; and

(3) They made no attempt to compare the rate of increase in the fixed loss threshold with the rate of inflation in commonly used inflationary indices (*e.g.*, the CPI-Medical Index).

*See* Am. Compl. ¶¶ 128-133. Plaintiffs contend that the Secretary's failure to account for these flaws led to an irrational increase in the fixed loss thresholds for fiscal years 1998 through 2006, which allegedly had the ultimate effect of reducing the number of Plaintiffs' cases that qualified for outlier payments and the amount of payments for those cases that did qualify. *Id.* ¶ 50.

### *C. Challenges to the Amount of Outlier Payments Provided to Plaintiffs for Fiscal Years 1998 Through 2006*

Third, Plaintiffs challenge "the amount of Medicare 'outlier' payments due Plaintiffs for services provided under the Medicare program for fiscal years 1998 - 2006." Am. Compl. ¶ 1. However, Plaintiffs do not claim that their fiscal intermediaries or the Secretary miscalculated their outlier payments or committed some other sort of clerical error in reaching a final determination as to the amounts owed to Plaintiffs. Rather, Plaintiffs contend that the "[a]rtificially high" fixed loss thresholds set by the Secretary for fiscal years 1998 through 2006 "meant fewer and lower" outlier payments to Plaintiffs. Pls.' Opp'n at 8. In this way, Plaintiffs' challenges to the amount of outlier payments that were provided to them are fundamentally intertwined with, and dependent upon, their challenges to the Secretary's Outlier Payment Regulations and the Fixed Loss Threshold Regulations. As those challenges go, so go Plaintiffs' challenges to the amount of outlier payments they were provided.

### *D. Challenges to the Secretary's "Implementation" and "Enforcement" of the Outlier Payment System*

Fourth, Plaintiffs' raise a handful of vague and non-specific allegations challenging the

Secretary's overall "implementation" and "enforcement" of the outlier payment system, allegations that are untethered to any discrete agency action. *See* Pls.' Opp'n at 8, 26-27 (citing Am. Compl. ¶¶ 3, 100). These allegations are consistent with two themes. In the first, Plaintiffs allege that the Secretary has "thwarted" Congress's supposed intent that hospitals should receive outlier payments approximating their marginal costs and has instead "created and implemented" a system that has resulted in "systematically den[ying] [hospitals] the financial protection that Congress intended." Am. Compl. ¶ 3. In the second, Plaintiffs allege that the Secretary has engaged in "selective" enforcement of the Outlier Payment Regulations by seeking to recover from hospitals submitting excessive reimbursement claims "while refusing to take the necessary steps to correct [] years of underpayments to [Plaintiffs]." *Id.* ¶ 162.[8]

### *E. Challenges to the Disposition of Monies Recovered in Proceedings Against Hospitals Submitting Excessive Reimbursement Claims*

Fifth, and finally, Plaintiffs seek to invoke the Court's jurisdiction under the Mandamus Act, 28 U.S.C. § 1361, to challenge the Secretary's disposition of $1.5 billion in proceeds that have allegedly been recovered under the False Claims Act in proceedings against hospitals that have submitted excessive reimbursement claims. *See* Pls.' Opp'n at 8 (citing Am. Compl. ¶¶ 15, 177). Plaintiffs contend that the Secretary has a non-discretionary duty to pay Plaintiffs an unspecified share of these proceeds under 42 U.S.C. § 1395i(k)(2)(C), a statutory provision relating to an expenditure account within the Federal Hospital Insurance Trust Fund known as the Health Care Fraud and Abuse Control Account. *See* Am. Compl. ¶¶ 180-87, 199-204.

---

[8] However, Plaintiffs disclaim any intention to "compel [the Secretary] to bring enforcement actions against third parties who have violated [the] regulatory scheme," Pls.' Opp'n at 28—namely, hospitals that have submitted excessive reimbursement claims.

## IV. DISCUSSION

The Court's discussion here proceeds in three parts. First, the Court will explain why the Secretary's Motion to Dismiss as it pertains to Plaintiffs' claims under the Medicare Act will be granted-in-part and denied-in-part. Briefly stated, the Court concludes that (a) Plaintiffs have stated sufficient facts at the pleading stage to support their standing, (b) Plaintiffs fail to state a plausible claim for relief based upon the Secretary's alleged failures in "implementing" and "enforcing" the outlier payment system, (c) Plaintiffs are not challenging the adequacy of the Secretary's enforcement efforts to prevent, detect, and control fraud in this action, and (d) although at first glance compelling, the Court declines to reach the remainder of the Secretary's merits-based arguments in the absence of the full administrative record. Second, the Court will explain why Plaintiffs have fallen woefully short of identifying the sort of clear and indisputable duty on the Secretary's part that is required to support a claim under the Mandamus Act. Third, and finally, the Court will address what steps need to be taken by the parties to proceed in this action.

### *A. The Secretary's Motion to Dismiss Plaintiffs' Claims Under the Medicare Act Will Be Granted-in-Part and Denied-in-Part*

#### 1. Plaintiffs Have Stated Sufficient Facts to Support Their Standing to Pursue Their Claims Under the Medicare Act

In her Motion to Dismiss, the Secretary argues at considerable length that Plaintiffs lack Article III standing to pursue some of the allegations raised in the Amended Complaint. *See* Def.'s Mem. at 20-27; Def.'s Reply at 3-8. Specifically, the Secretary contends that Plaintiffs are without standing to pursue "[c]laims asserting that supposed weaknesses in [the Secretary's] policies drove other hospitals to commit acts of fraud, and that [Plaintiffs] were eventually

harmed by those acts of fraud." Def.'s Reply at 4. The Secretary's standing argument need not detain this Court long, at least at this stage, as it rests upon a fundamental misunderstanding of Plaintiffs' claims in this action, something that is entirely understandable given the extraordinary breadth of the allegations raised in the Amended Complaint.

As set forth in detail above, Plaintiffs claims under the Medicare Act fall into four basic categories. *See supra* Part III.A-D.[9] Plaintiffs challenge (1) the validity of the Secretary's Outlier Regulations in the form that they existed between 1988 and 2003, (2) the validity of the Secretary's Fixed Loss Threshold Regulations for fiscal years 1998 through 2006, (3) the Secretary's determinations as to the amount of outlier payments that Plaintiffs were entitled to receive for fiscal years 1998 through 2006, and (4) the Secretary's "implementation" and "enforcement" of the outlier payment system in a way that allegedly failed to correct outlier "underpayments" and resulted in denying Plaintiffs the financial protection that Congress intended. There is a common thread between these four categories: they are all directed towards the Secretary's actions or inactions and they all contemplate Plaintiffs receiving fewer and lesser outlier payments than they otherwise allegedly should have.[10]

The "irreducible constitutional minimum" of standing requires: (i) an injury-in-fact; (ii)

---

[9] A fifth category, premised on Plaintiffs' contention that the Secretary failed to perform an alleged non-discretionary duty to pay to Plaintiffs an unidentified portion of funds recovered against hospitals submitting excessive reimbursement claims, arises under the Mandamus Act and is addressed elsewhere in this opinion. *See infra* Part IV.B.

[10] For this reason, the Secretary's heavy reliance on authorities addressing the situation where a plaintiff has brought suit based upon an indirect injury allegedly flowing from the government's regulation of a third party is misplaced. *See, e.g.*, *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 40-46 (1976); *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1273-78 (D.C. Cir. 2007); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937-45 (D.C. Cir. 2004), *cert. denied*, 545 U.S. 1104 (2005).

causation; and (iii) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In many cases, a plaintiff's "standing to seek review of administrative action is self-evident," including where, as here, "the complainant is 'an object of the action (or forgone action) at issue'—as is the case usually in review of a rulemaking and nearly always in review of an adjudication." *Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 900 (D.C. Cir. 2002) (quoting *Lujan*, 504 U.S. at 561-62); *see also Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 734 (D.C. Cir. 2003). Consistent with this observation, the Secretary concedes, as she must, that Plaintiffs do "have standing to bring the claims . . . that assert that [she] made errors that directly affected their payments." Def.'s Reply at 4. That is, the Secretary admits that Plaintiffs can challenge the determinations as to the amount of outlier payments that Plaintiffs were provided in fiscal years 1998 through 2006—the third of the four categories identified above. Significantly, from this lone concession, the conclusion that Plaintiffs also have standing to bring the challenges in the first and second categories—*i.e.*, the challenges to the validity of the Outlier Payment Regulations and the Fixed Loss Threshold Regulations—ineluctably follows, as the Secretary necessarily relied upon, and applied, these regulations when her designees determined Plaintiffs' entitlement to outlier payments for the fiscal years in question. *See Russell-Murray Hospice, Inc. v. Sebelius*, 724 F. Supp. 2d 43, 53 (D.D.C. 2010) ("[T]he fact that the challenged regulation was directly applied to the plaintiff strongly supports the conclusion that it has standing to challenge that regulation.").[11]

[11] Even if Plaintiffs' arguments as to *why* these regulations are arbitrary or capricious may depend, in part, upon the effect the regulations had upon the behavior of third parties, the regulations indisputably were applied directly to determine the compensation to which Plaintiffs were entitled. However, strictly speaking, Plaintiffs do not actually argue that the regulations are arbitrary or capricious in light of the effect that they had on third parties. More accurately, their

The fourth and final category—Plaintiffs' challenges to the "implementation" and "enforcement" of the outlier payment system—merits like treatment, even if the claims in this category fit awkwardly in the standing framework by virtue of the fact that, as explained below, they fail to state a plausible entitlement to relief. *See infra* Part IV.A.2. Plaintiffs tender a handful of vague and non-specific allegations contending that the Secretary implemented and enforced the outlier payment system in a way that failed to correct outlier "underpayments" and resulted in denying Plaintiffs the financial protection that Congress intended. In this regard, the category is similarly premised upon the contention that the Secretary's actions or inactions caused Plaintiffs direct economic harm. These allegations, although insufficient to state a plausible claim for relief, pass muster to support a finding of standing at the pleading stage. *See Sierra Club*, 292 F.3d at 898-99 ("At the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice.'") (quoting *Lujan*, 504 U.S. at 561).

In short, Plaintiffs' claims under the Medicare Act are each directed towards challenging administrative action or inaction having an immediate impact upon them as regulated entities. At this early stage in the proceedings, their allegations are sufficient to establish their standing to challenge (1) the validity of the Secretary's Outlier Regulations in the form that they existed between 1988 and 2003, (2) the validity of the Secretary's Fixed Loss Threshold Regulations for fiscal years 1998 through 2006, (3) the Secretary's determinations as to the amount of outlier payments that Plaintiffs were entitled to in fiscal years 1998 through 2006, and (4) the

---

argument is that the Secretary failed to fully grapple with the effect her regulations would have (or were having) on the behavior of third parties and the implications of that third-party behavior on the outlier payment system as a whole, and that by failing to grapple with this problem, the Secretary failed to examine all the relevant data and articulate a satisfactory explanation for her chosen course of action.

Secretary's "implementation" and "enforcement" of the outlier payment system. Therefore, the Court will deny the Secretary's Motion to Dismiss insofar as it seeks dismissal of Plaintiffs' claims under the Medicare Act for lack of standing.

Nonetheless, it may very well prove to be the case that, as the parties proceed along the path towards summary judgment, the nature and scope of Plaintiffs' claims will further crystallize and come into sharper focus. The Court's opinion today is not intended, nor should be construed, to foreclose the Secretary from revisiting her arguments as to Plaintiffs' standing or lack thereof upon further development of the record.

### 2. Plaintiffs Fail to State a Plausible Claim for Relief Based Upon the Secretary's Alleged Failures in "Implementing" and "Enforcing" the Outlier Payment System

Judicial review of Plaintiffs' claims under the Medicare Act rests on 42 U.S.C. § 1395oo(f)(1), which incorporates the Administrative Procedure Act (the "APA"). *See* 42 U.S.C. § 1395oo(f)(1) ("Such action[s] . . . shall be tried pursuant to the applicable provisions under chapter 7 of Title 5."); *see also Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 719 (D.C. Cir. 2009). Under the APA, the reviewing court is generally confined to evaluating "final agency action," 5 U.S.C. § 704, which may include "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," *id.* § 551(13). Each of these enumerated categories implicates "circumscribed, discrete agency actions," a limitation designed in large part "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 & 66 (2004). As the Secretary correctly observes, these strictures preclude "a blunderbuss attack on an entire program based on its

supposed failure to achieve abstract goals." Def.'s Mem. at 28.[12]

Despite the extraordinary breadth of the Amended Complaint, Plaintiffs allegations are, for the most part, tethered to the sort of "circumscribed, discrete agency actions" that are subject to judicial review—namely, (a) the Secretary's promulgation of the Outlier Payment Regulations, (b) the Secretary's promulgation of the Fixed Loss Threshold Regulations, and (c) the Secretary's determinations as to the amount of outlier payments that Plaintiffs would receive for fiscal years 1998 through 2006. In contrast, Plaintiffs' vague and non-specific allegations challenging the Secretary's overall "implementation" and "enforcement" of the outlier payment system plainly

---

[12] Although it is not altogether clear, the Secretary at times appears to go even farther and suggest that review under 42 U.S.C. § 1395oo(f)(1) is limited not just to challenging discrete agency action, but to one specific form of discrete agency action—namely, the agency's final determinations as to the amount of outlier payments that a provider will receive for a given fiscal year, *see* Def.'s Mem. at 29; Def.'s Reply at 13—a view that would, presumably, foreclose judicial review of the Secretary's rules and regulations under § 1395oo(f)(1). To the extent the Secretary intended to make this argument, it is unsupported by any on-point authority and appears to run counter to established precedent. Because the Medicare Act "generally forecloses other avenues of review," *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 809 (D.C. Cir. 2001) (citing 42 U.S.C. §§ 405(h), 1395ii), parties "must channel [their] complaints through the administrative review procedures set forth in the statute," *Russell-Murray Hospice*, 724 F. Supp. 2d at 49 (citing 42 U.S.C. §§ 405(h), 1395ii). This means that "[p]arties challenging Medicare rules [and regulations] must exhaust the agency review process regardless of whether the matter involves a direct constitutional, statutory, or regulatory challenge." *Three Lower Counties Cmty. Health Servs. v. U.S. Dep't of Health & Human Servs.*, 317 F. App'x 1, 1 (D.C. Cir. 2009) (*per curiam*) (citing *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 5 (2000)). However, since neither the fiscal intermediary nor the PRRB has the authority to declare regulations invalid, providers may, as Plaintiffs did in this case, file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matter in controversy. 42 U.S.C. § 1395oo(f)(1). If the PRRB determines that it lacks the authority to decide the question, it may certify the question for "expedited judicial review." *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 406-07 (1988). Consistent with this scheme, courts routinely consider challenges to the Secretary's rules and regulations when exercising jurisdiction under 42 U.S.C. § 1395oo(f)(1). *See, e.g.*, *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 31 (D.C. Cir. 2005); *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222 (D.C. Cir. 1993); *Tucson Med. Ctr. v. Sullivan*, 947 F.2d 971, 976 (D.C. Cir. 1991).

"lack the specificity requisite for agency action." *S. Utah Wilderness Alliance*, 542 U.S. at 66. For example, Plaintiffs free-floating allegations that the Secretary has "thwarted" Congressional intent by "systematically deny[ing]" hospitals the protection that Congress intended and by "refusing to take steps to correct [] years of underpayments," Am. Compl. ¶¶ 3, 162, comprise the very sort of "broad programmatic attack" directed towards "[g]eneral deficiencies in compliance" with "broad statutory mandates" that fall beyond the ambit of judicial review under the APA, *S. Utah Wilderness Alliance*, 542 U.S. at 64, 66. Therefore, the Court will grant the Secretary's Motion to Dismiss insofar as it seeks dismissal of Plaintiffs' claims premised upon allegations challenging the Secretary's overall "implementation" and "enforcement" of the outlier payment system that are untethered to any discrete agency action.[13]

**3. Plaintiffs Are Not Challenging The Adequacy of the Secretary's Enforcement Efforts to Prevent, Detect, and Control Fraud**

It is a basic and unobjectionable principle of administrative law that judicial review cannot extend to "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). In order for the district court to exercise its judicial function, there must be "law to apply," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), and judicial review will not lie where the governing statute and regulations are "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Relying upon these principles, the Secretary argues at some length that Plaintiffs "cannot

[13] Which is not to say that Plaintiffs are foreclosed from raising issues of Congressional intent, and the like, in future submissions, only that such issues must be made in the context of an argument that some circumscribed and discrete action taken by the Secretary was arbitrary or capricious.

challenge the adequacy of [her] efforts to prevent, detect, and control false inflation of charges in outlier payments," because "agencies' decisions about whether, when, and how to pursue violations of law are committed to agency discretion since they involve sensitive judgments about resource allocation and agency priorities that courts are not well-equipped to review." Def.'s Mem. at 32-33.

Were Plaintiffs in fact challenging the Secretary's "[r]efusals to take enforcement steps" against hospitals submitting excessive reimbursement claims, *Heckler*, 470 U.S. at 831, such as seeking to recoup payments in administrative enforcement proceedings or commencing proceedings under the False Claims Act, then the Court would be inclined to agree. However, the Secretary's argument, at least as it is framed in her Motion to Dismiss, rests on a fundamental misconstruction of Plaintiffs' claims in this action. In this case, Plaintiffs expressly disavow any challenge to the Secretary's discretion "to bring enforcement actions against third parties who have violated [the] regulatory scheme." Pls.' Opp'n at 28. That is, they are not challenging the adequacy of the Secretary's enforcement efforts to prevent, detect, and control fraud committed by unscrupulous hospitals *per se*. Rather, as described in detail above, *see supra* Part III.A-C, Plaintiffs are challenging as arbitrary and capricious the Outlier Payment Regulations and the Fixed Loss Threshold Regulations, as well as the application of those regulations in fixing the amount of outlier payments to which Plaintiffs would be entitled. As part of these challenges, Plaintiffs intend to argue that the Secretary failed to fully grapple with the effect her regulations would have (or were having) on the behavior of third parties and the implications of that third-party behavior on the outlier payment system as a whole, and that by failing to grapple with this problem, the Secretary failed to examine all the relevant data and articulate a satisfactory

explanation for her chosen course of action. *See supra* Part III.A-C. While these arguments may, at a high level of abstraction, be described as challenging the Secretary's ability to "control fraud," they are in actuality targeted towards challenging the Secretary's administrative decisionmaking process in the context of discrete, circumscribed agency action. In the end, these arguments may or may not prove to have merit, but it is premature to ask that question in the absence of the administrative record. *See infra* Part IV.A.4.[14]

**4. The Court Declines to Reach the Merits of the Secretary's Remaining Arguments for Dismissal of Plaintiffs' Medicare Claims in the Absence of the Administrative Record**

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The entire case is a question of law," and the "complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion[s] to be drawn about the agency action." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). Therefore, the question is not whether the plaintiff has "raised genuine issues of material fact," but whether, "based on the agency record[,] . . . the agency acted arbitrarily or capriciously." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (citing 5 U.S.C. § 706), *cert. denied sub nom. Rempfer v. Hamburg*, __ U.S. __, 130 S. Ct. 1707 (2010).

When presented with a motion to dismiss for failure to state a claim, the district court

[14] While the Court rejects the Secretary's argument as it is framed in her Motion to Dismiss, which speaks to what is essentially a phantom claim, it may be that certain aspects of the Secretary's decisionmaking process in connection with the discrete agency actions at issue are either committed to her discretion by law or are not governed by meaningful standards to guide the Court's review. Should that be the case, the Secretary is of course free to raise such issues when the Court has the benefit of the full administrative record to evaluate how and in what way the Secretary may have exercised her discretion.

may, in appropriate circumstances, reach the merits even in the absence of the administrative record, as when the parties' arguments can be resolved with reference to nothing more than the relevant statute and its legislative history. *See Dist. Hosp. Partners,* 2011 WL 2621000, at *6-7. Moreover, a court may generally take judicial notice of materials published in the Federal Register without converting the motion to one for summary judgment. *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed.").[15]

Nevertheless, in recognition of the dangers associated with proceeding with judicial review "on the basis of a partial and truncated record" without the consent of the parties, *Natural Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 291-92 (D.C. Cir. 1975), when the arguments raised go to the question of whether the agency has adhered to the standards of decisionmaking required by the APA, the United States Court of Appeals for the District of Columbia Circuit has advised that the "better practice" is to test the parties' arguments in the context of a motion for summary judgment and with reference to the full administrative record. *Marshall Cnty.*, 988 F.2d at 1226 n.5. "If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984); *see also Occidental Petroleum Corp. v. Secs. & Exch. Comm'n*, 873 F.2d 325, 338 (D.C. Cir. 1989) ("[I]n order to allow for

---

[15] Contrary to Plaintiffs' characterization, this Court's decision in *Lake Pilots Ass'n v. U.S. Coast Guard*, 257 F. Supp. 2d 148 (D.D.C. 2003), does not stand for the proposition that "considering [materials in the] Federal Register would convert a motion to dismiss to a motion for summary judgment." Pls.' Opp'n at 14. The short footnote relied upon by Plaintiffs for this characterization simply provides that the Court had construed the motion then before it as one for summary judgment because it involved consideration of "the administrative record that was before the agency at the time it made its decision." *Lake Pilots Ass'n.*, 257 F. Supp. 2d at 150 n.1. True, the Court considered materials in the Federal Register, but its review was not so limited. *See id.* at 166.

meaningful judicial review, the agency must produce an administrative record that delineates the path by which it reached its decision.").

Consistent with this guidance, courts routinely exercise their discretion to decline to reach the ultimate question of whether the agency's decisionmaking process was arbitrary or capricious in the absence of the full administrative record. *See, e.g.*, *Ravulapalli v. Napolitano*, __ F. Supp. 2d __, No. 10 Civ. 447 (CKK), 2011 WL 1126055, at *10 (D.D.C. Mar. 29, 2011); *Int'l Longshoremen's Ass'n, AFL-CIO v. Nat'l Mediation Bd.*, No. 04 Civ. 824 (RBW), 2005 WL 850358, at *4 (D.D.C. Mar. 30, 2005).[16] Indeed, this Court has done just that when presented with motions to dismiss similar challenges to the Secretary's administration of the Medicare Act. *See Dist. Hosp. Partners*, 2011 WL 2621000, at *7; *Swedish Am. Hosp. v. Sebelius*, 691 F. Supp. 2d 80, 88-89 (D.D.C. 2010).

In this case, the Secretary raises a litany of arguments that are best decided only in the context of a motion for summary judgment, at which point the parties and the Court will have the benefit of the administrative record. *See* Def.'s Mem. at 35-44; Def.'s Reply at 19-24. While the Secretary's arguments at first glance appear to be compelling, the claims raised by Plaintiffs require the Court to ascertain whether the Secretary examined all the relevant data and articulated

---

[16] Plaintiffs contend that in *Piersall v. Winter*, 435 F.3d 319 (D.C. Cir. 2006), the United States Court of Appeals for the District of Columbia Circuit held that it "would not reach the merits of [an] APA challenge without the certified administrative record." Pls.' Opp'n at 13. To put it generously, this is an inaccurate description of the Court of Appeals' holding. In *Piersall*, the district court dismissed the action at the outset for lack of subject matter jurisdiction; the administrative record was never submitted and the parties did not develop the merits before the district court. *See Piersall*, 435 F.3d at 325. After concluding that the district court erred in dismissing the action for lack of subject matter jurisdiction, the Court of Appeals merely declined to reach the merits without first remanding based on the principle that an appellate court generally should refrain from considering an issue that has not been raised before the district court. *See id.*

a satisfactory explanation for her chosen course of action. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Without the administrative record, the Court is unable to perform this function. Therefore, the Court will deny the remainder of the Secretary's Motion to Dismiss insofar as it seeks dismissal of Plaintiffs' claims under the Medicare Act. The Court will require the Secretary to produce the administrative record before reaching the merits of these arguments.[17] Simply put, the Secretary would have this Court wade into the details of its decisionmaking process on a motion to dismiss. Such an approach invites error, and this Court declines the Secretary's invitation.

### *B. Plaintiffs' Claim Under the Mandamus Act Will Be Dismissed for Failure to State a Plausible Claim for Relief*

Plaintiffs assert a claim that is styled as arising under the Mandamus Act, 28 U.S.C. § 1361. *See* Am. Compl. ¶¶ 180-87, 199-204. Under the Mandamus Act, district courts have original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. In recognition of the drastic nature of mandamus, jurisdiction under the statute is exceedingly narrow. *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (*en banc*). Mandamus-type relief may issue if, and only if, (i) the plaintiff has a clear and indisputable right to relief, (ii)

---

[17] The Court does not doubt that there are circumstances in which dismissal under Rule 12(b)(6) will be appropriate even in the absence of the full administrative record. The Secretary identifies one such circumstance, noting that if a plaintiff were only to allege that an agency promulgated a rule without providing adequate advance notice, and the agency were to identify a notice published in the Federal Register providing the required notice, a court could properly dismiss the claim under Rule 12(b)(6). *See* Def.'s Reply at 10 n.3. Or, to use an example relevant to the present action, dismissal may be appropriate where the plaintiff's pleadings fail to identify a discrete, circumscribed agency action subject to review under the APA. *See supra* Part III.A.2. Dismissal is particularly appropriate in such a case because there will be no concrete administrative record to anchor judicial review.

the defendant has a clear duty to act, and (iii) there is no other adequate remedy available. *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002). In this case, Plaintiffs seek mandamus to compel the Secretary to exercise what they claim is her non-discretionary duty to pay Plaintiffs an unspecified share of $1.5 billion in proceeds that have allegedly been recovered under the False Claims Act in proceedings against hospitals that have submitted excessive reimbursement claims. *See* Am. Compl. ¶¶ 180-87, 199-204; Pls.' Opp'n at 40-42.

### 1. Plaintiffs Have Failed to Identify a "Clear and Compelling" Basis for the Alleged Non-Discretionary Duty

To support mandamus jurisdiction, the proffered legal basis for the defendant's duty must be "clear and compelling." *In re Cheney*, 406 F.3d at 729. That means that the duty "must be so plainly prescribed as to be free from doubt and equivalent to a positive command." *Consol. Edison Co. of N.Y. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir.) (internal quotation marks omitted), *cert. denied*, 537 U.S. 1029 (2002). "[I]f there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action." *In re Cheney*, 406 F.3d at 729.[18]

In this case, Plaintiffs assert that the Secretary has a non-discretionary duty to pay them an unspecified share of the proceeds that have allegedly been recovered under the False Claims Act in proceedings against hospitals that have submitted excessive reimbursement claims. *See* Am. Compl. ¶¶ 180-87, 199-204; Pls.' Opp'n at 40-42. Plaintiffs contend that this duty emanates

---

[18] "To this extent, mandamus jurisdiction under § 1361 merges with the merits." *In re Cheney*, 406 F.3d at 729. That is, the question of whether the statute relied upon imposes a clear and compelling duty on the defendant is a "merits issue." *Auburn Reg'l Med. Ctr. v. Sebelius*, 686 F. Supp. 2d 55, 62 (D.D.C. 2010), *rev'd on other grounds*, __ F.3d __, No. 10-5115, 2011 WL 2507853 (D.C. Cir. June 24, 2011). Therefore, if dismissal rests on a plaintiff's failure to point to a clear and compelling duty, it should be treated as a dismissal for failure to state a plausible entitlement to relief, not as a dismissal for lack of subject matter jurisdiction. *Ahmed v. Dep't of Homeland Sec.*, 328 F.3d 383, 386-87 (7th Cir. 2003).

from 42 U.S.C. § 1395i(k)(2)(C), a statutory provision relating to an expenditure account within the Federal Hospital Insurance Trust Fund ("Trust Fund") known as the Health Care Fraud and Abuse Control Account. *See* 42 U.S.C. § 1395i(a), (k)(1). The contention is without merit.

The inquiry begins and ends with the statutory text. Section 1395i(k)(2)(C) provides, in relevant part, as follows:

> The Managing Trustee shall transfer to the Trust Fund . . . an amount equal to the sum of the following:
>
> * * *
>
> (iv) Penalties and damages obtained and otherwise creditable to miscellaneous receipts of the general fund of the Treasury obtained under sections 3729 through 3733 of Title 31 (known as the False Claims Act), in cases involving claims related to the provision of health care items and services (other than funds awarded to a relator, for restitution or otherwise authorized by law).

42 U.S.C. § 1395i(k)(2)(C). To put it bluntly, Plaintiffs' argument as to why this language requires the Secretary to pay them anything is so devoid of merit that it is difficult to reduce to writing. So far as the Court can tell, the argument proceeds in four basic steps: Plaintiffs begin by observing that the requirement that certain penalties and damages obtained under the False Claims Act be transferred to the Trust Fund does not apply to funds awarded to a relator for "restitution," couple that unobjectionable observation with the naked assertion that they are entitled to restitution, paint the use of the word "shall" as mandatory language that disallows the exercise of discretion, and conclude by positing that the Secretary is somehow obligated to pay them some unspecified share of restitution-related proceeds. *See* Pls.' Opp'n at 40-41.

Whatever the merits of Plaintiffs' argument in the abstract, it has virtually no connection to the actual text of § 1395i(k)(2)(C). True, the provision employs the word "shall," a term that

traditionally denotes a mandatory duty, but by its plain language, the provision requires one thing, and one thing only: "[t]he Managing Trustee" must "transfer" certain monies obtained under the False Claims Act "[t]o the Trust Fund." 42 U.S.C. § 1395i(k)(2)(C).

Undeterred, Plaintiffs attempt to conjure from § 1395i(k)(2)(C) a non-discretionary duty on the Secretary's part to pay Plaintiffs an unspecified share of the proceeds that have allegedly been recovered under the False Claims Act in proceedings against hospitals that have submitted excessive reimbursement claims. Their argument hinges on the statute's exclusion from the "[p]enalties and damages" that the Managing Trustee must transfer to the Trust Fund any "funds awarded to a relator, for restitution or otherwise authorized by law." 42 U.S.C. § 1395i(k)(2)(C)(iv). Plaintiffs first claim that they are entitled to "restitution" and, in a wild leap of logic, contend that the exclusion of restitution-related proceeds from the scope of the statute somehow requires the Secretary to pay them an unspecified amount of restitution. However, by its unambiguous terms, the statute concerns only the Managing Trustee's responsibilities in transferring monies to the Trust Fund—no more and no less. *See id.* When read in its context, all the exclusionary language does is limit the scope of the Managing Trustee's transfer responsibilities: whereas the Managing Trustee must transfer the bulk of penalties and damages to the Trust Fund, he need not transfer "funds awarded to a relator, for restitution or otherwise authorized by law." *Id.* Meanwhile, the provision is completely silent on the proper use and disposition of monies that are not transferred by the Managing Trustee to the Trust Fund, including those "funds awarded to a relator, for restitution or otherwise authorized by law." The upshot is this: this provision cannot possibly be read as entitling anyone, let alone Plaintiffs, to a

payment of restitution.[19]

In short, far from identifying a clear and indisputable duty owed to them by the Secretary, Plaintiffs' claim for mandamus-type relief relies upon a wholly implausible and unsustainable reading of the relevant statute. Due to the absence of a clear and compelling legal basis for the duty asserted, the Court will dismiss Plaintiffs' claim under the Mandamus Act.

### 2. Plaintiffs Are Not Entitled to Jurisdictional Discovery

In a last-ditch effort, Plaintiffs attempt to salvage their claim under the Mandamus Act by arguing that they should be permitted to conduct jurisdictional discovery of (a) the Secretary's historical interpretation of the term "restitution" and (b) the disposition of $1.5 billion in proceeds that have allegedly been recovered under the False Claims Act in proceedings against hospitals that have submitted excessive reimbursement claims. *See* Pls.' Opp'n at 43-44. The argument is unavailing.

As a threshold matter, Plaintiffs have never actually filed a motion for jurisdictional discovery; a passing argument made in opposition to a motion to dismiss simply will not suffice. However, more to the point, a party is not entitled to jurisdictional discovery to establish mandamus jurisdiction absent a detailed showing that the additional discovery would alter the district court's conclusion. *See Baptist Mem'l Hosp. v. Johnson*, 603 F. Supp. 2d 40, 44-45 (D.D.C. 2009), *aff'd sub nom. Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57 (D.C. Cir. 2010). None of the evidence that could hypothetically be uncovered by Plaintiffs' vague discovery

---

[19] As if this were not enough, Plaintiffs' argument suffers from another fatal defect—the Secretary, who is the only defendant in this action, is mentioned nowhere in § 1395i(k)(2)(C). The transfer obligations imposed by the statute run to the Managing Trustee of the Trust Fund—*i.e.*, the Secretary of the Treasury. *See* 42 U.S.C. § 1395i(b). Therefore, whatever duties arise under the statute, they cannot be enforced against the Secretary.

requests could possibly transform § 1395i(k)(2)(C) into anything other than a statement as to the responsibilities of the Secretary of the Treasury in transferring certain monies to the Trust Fund. In other words, the requested discovery has no bearing on the question of whether the statute imposes a clear and indisputable duty on the Secretary's part to pay Plaintiffs an unspecified share of the proceeds that have allegedly been recovered under the False Claims Act. *See Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206 (1930) ("[W]here the duty is not [] plainly prescribed, but depends upon a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus."). The Court will not exercise its discretion to authorize Plaintiffs to go on a fishing expedition, particularly one that can bear no fish.

### *C. Next Steps and Further Proceedings in this Action*

For the reasons described above, *see supra* Part III.A.4, the Court declines to reach the merits-based arguments raised by the Secretary as a basis for dismissing Plaintiffs' remaining claims without the benefit of the full administrative record. Nevertheless, the Court is not presently convinced that proceeding immediately to the filing of the administrative record and the subsequent briefing of motions for summary judgment going to the merits of Plaintiffs' claims would be the most expeditious manner of proceeding in this action.

For example, it is evident from the Secretary's Motion to Dismiss that she has been laboring under a misapprehension as to the nature and scope of Plaintiffs' claims, something that is entirely understandable given the extraordinary breadth of the allegations in the Amended Complaint. Now that the Court has identified the discrete agency actions that remain at issue in this action, the Secretary may consider it appropriate to seek dismissal of some or all of

Plaintiffs' claims under the Medicare Act based upon a theory that Plaintiffs may have failed to fully exhaust their administrative remedies or to commence suit within the applicable statute of limitations, issues which were not raised by the Secretary in her Motion to Dismiss. *See* Def.'s Mem. at 15 n.6. The Court emphasizes that it expresses no view on the merits of any such arguments, as the record before the Court simply does not speak to those questions.[20] Nonetheless, it may be that permitting the Secretary to raise such arguments before proceeding in this action could reduce the scope of the administrative record that would need to be compiled and narrow the parties' focus to the key claims at issue.

Alternatively, it may be that the resolution of some of Plaintiffs' claims may, for all practical purposes, be dispositive of Plaintiffs' other claims. For instance, it is clear that Plaintiffs' challenges to the outlier payments that they received for fiscal years 1998 through 2006 are intertwined with, and dependent upon, Plaintiffs' challenges to the Outlier Payment Regulations and the Fixed Loss Threshold Regulations. As those challenges go, so go Plaintiffs' challenges to the amount of outlier payments they were provided. For this reason, a staggered briefing schedule allowing the parties to address the key issues before reaching subsidiary issues may prove economical.

At this point, the Court considers it appropriate to gain some further clarity as to the

---

[20] Plaintiffs claim that they have exhausted all administrative remedies "by appealing their underpayment for outlier claims before the Provider Reimbursement Review Board . . . for each of the [fiscal years] here at issue." Am. Compl. ¶ 20. While that may mean that Plaintiffs have exhausted their administrative remedies with respect to the determinations as to the amount of outlier payments that they would receive for fiscal years 1998 through 2006, that does not *ipso facto* mean that they have fully exhausted their administrative remedies to challenge the Outlier Payment Regulations and the Fixed Loss Threshold Regulations. *See, e.g.*, *Cape Cod*, 630 F.3d at 210-11 ("[C]ourts ordinarily refuse to consider objections not submitted in accordance with agency procedures during the rulemaking process.").

precise contours of Plaintiffs' claims and to permit the parties an opportunity to meet and confer about how best to proceed in this action. To this end, the Court will require Plaintiffs to file a "notice of claims" on or before Wednesday, July 27, 2011, identifying, in bullet-point format, each circumscribed, discrete agency action that Plaintiffs intend to challenge in this action,[21] which shall include references to each iteration of the Outlier Payment Regulations and Fixed Loss Threshold Regulations that Plaintiffs intend to challenge, with citations to the Code of Federal Regulations or the Federal Register, as appropriate. *See, e.g.*, *supra* Part III.B n.7. Thereafter, the parties must promptly meet and confer in a good faith effort to devise an agreed-upon plan for proceeding in this action in an expeditious yet efficient manner. On or before Wednesday, August 10, 2011, the parties shall file a joint status report with the Court proposing a schedule for proceeding in this action. If the parties are unable to agree on a plan for proceeding in this action, they may set out their positions separately in the joint status report. Upon reviewing the parties' submission, the Court will consider whether it requires further information from the parties in deciding how to proceed.

## V. CONCLUSION

For the reasons set forth above, the Secretary's [17] Motion to Dismiss will be granted-in-part and denied-in-part. Specifically, (1) the motion will be granted insofar as it seeks dismissal of (a) Plaintiffs' claims under the Medicare Act based upon allegations challenging the Secretary's "implementation" and "enforcement" of the outlier payment system that are unconnected to any discrete agency action, and (b) Plaintiffs' claim under the Mandamus Act;

---

[21] To be clear, Plaintiffs may not expand the scope of their "notice of claims" to identify agency actions that do not fall within the scope of the Amended Complaint, which the Court has summarized in this opinion. *See supra* Part III.

and (2) the motion will otherwise be denied. On or before Wednesday, July 27, 2011, Plaintiffs shall file a "notice of claims" with the Court identifying, in bullet-point format, each circumscribed, discrete agency action that Plaintiffs intend to challenge. Plaintiffs' submission shall include references to each iteration of the Outlier Payment Regulations and Fixed Loss Threshold Regulations that Plaintiffs intend to challenge in this action, with citations to the Code of Federal Regulations or the Federal Register, as appropriate. On or before Wednesday, August 3, 2011, the Secretary shall serve and file an Answer to the Amended Complaint. On or before Wednesday, August 10, 2011, the parties shall file a Joint Status Report with the Court proposing a schedule for proceeding in this action. An appropriate order accompanies this memorandum opinion.

Date: July 15, 2011

/s/

**COLLEEN KOLLAR-KOTELLY**
United States District Judge